[Civ. No. 11862. Fourth Dist., Div. Two. June 28, 1972.]

LARRY SCOTT CARR, a Minor, etc., et al.,
Plaintiffs and Appellants, v.
PACIFIC TELEPHONE COMPANY et al., Defendants and Respondents.

**Counsel**

John K. Trotter, Jr., for Plaintiffs and Appellants.

Miller, Nisson & Kogler and Clark Miller for Defendants and Respondents.

**Opinion**

**KERRIGAN, J.**—This is an action by the widow and minor children of Fred W. Carr, deceased, to recover damages from a telephone company

for his wrongful death. The jury returned with a defense verdict. Plaintiffs' motion for a new trial was denied, and plaintiffs appeal from the judgment.[1]

The trial court instructed the jury on the doctrine of assumption of risk (BAJI No. 4.30, as modified) and admitted some evidence of the fact that decedent had been involved in an immoral affair with a minor in 1961 and had suffered a conviction for issuing checks without sufficient funds for which he served a prison sentence in 1967. Plaintiffs maintain on appeal that the court erred in rendering the assumption of risk instruction and admitting evidence of decedent's character and prior criminal record.

In mid-February 1970, Orange County experienced some heavy winds. On Thursday evening, February 19, a huge eucalyptus tree fell from the force of the wind, landing in the backyard, and upon the garage and home of Mr. and Mrs. Bearden at 1251 Smoketree Lane in or near the city of Tustin. In the course of the fall, the tree also landed on the utility cables or lines of defendant Pacific Telephone Company, as well as those of Edison Company and a cable T-V company. Mr. Bearden notified all the utility companies that the tree had fallen on their lines. The next evening, Friday, February 20, a telephone company representative visited the scene. He called his supervisor to ". . . have someone else look at the situation. . . ." A telephone company supervisory foreman visited the residence the same night and requested that a telephone crew be dispatched the next day to replace or repair the telephone wires after the tree was removed from the cable. The Beardens employed Mr. Beck, dba Tip Top Tree Service, a private tree trimmer, to remove the tree from their home and garage. Beck assigned Fred W. Carr [decedent] to remove the tree from the lines, house and garage.

The next morning, Saturday [February 21] a telephone company foreman and two aerial linemen arrived on the scene at 7:30 a.m. Carr ap-

---

[1]The jury returned with the verdict on June 9, 1971; judgment was entered June 11, 1971; motion for a new trial was denied August 10, 1971; on August 16, 1971, plaintiffs filed a notice of appeal ". . . from that certain judgment, ruling or order made and entered by the court in this action on August 10, 1971, which *order denied* plaintiffs' *motion for new trial*." On February 17, 1972, plaintiffs filed a petition to correct the record so as to change the notice of appeal to read ". . . that plaintiffs hereby appeal . . . from that certain judgment, ruling or order made and entered by the court in this action on June 11, 1971, . . ."; the petition to correct the record was denied; therefore, defendant maintains that the purported appeal is from the order denying the motion for a new trial and that said order is nonappealable (see Code Civ. Proc., § 904.1) and the appeal should be dismissed. However, the law favors disposition of appeals on the merits, and in support of such policy, it has been deemed that the notice of appeal should be liberally construed. Consequently, we will review the matter as an appeal from the judgment. (See *Vibert* v. *Berger*, 64 Cal.2d 65, 67-69 [48 Cal.Rptr. 886, 410 P.2d 390]; Cal. Rules of Court, rule 1.)

peared at 8 a.m. The telephone men secured the telephone lines by tying a rope around a standing tree, then around the telephone lines, and then around another standing tree. While the telephone company employees and Carr were still at the scene, Mr. Beck of the Tip Top Tree Service phoned the Bearden residence and inquired whether Carr needed any help. Carr responded that he didn't need any assistance. One of the telephone linemen also asked Carr if he required assistance, and he replied, "No."

Carr started the tree removal operation. The tree had fallen from the rear of the residence toward the front of the lot. He started from the top of the tree and made two cuts. On the third cut, as he was moving from the rear of the house to the rear fence, the remainder of the tree trunk was flung up into the air as a result of the tension created by the telephone wires. The 8-10 foot trunk landed on Carr, resulting in major injuries which caused his death on February 24, 1970.

Carr's employer testified that he was a competent tree trimmer capable of handling almost any situation. His wife testified that he had been employed in the early 1960's as a tree trimmer with the State of California.

Turning to the defendant's personal history and background, the evidence reflected that Carr had three minor children by virtue of his prior marriage to Joan Carr, also known as Joan Breland. In 1958 he married Jean Scott Carr and they had one child, Larry Scott Carr, born November 10, 1958. He and Jean separated temporarily during the years 1961-1963.

At the outset of the trial, respective counsel met with the court in chambers. Plaintiffs' attorney informed the court that he anticipated that defense counsel intended to produce evidence to the effect that Carr had suffered two prior felony convictions, and that he strongly objected to any evidence that defendant had suffered two felony convictions during his 12-year marriage to Jean Scott Carr; that he was principally objecting to any evidence pertaining to a 1961 conviction for statutory rape; while counsel's objection to the admission of any evidence concerning a 1967 conviction for passing bad checks was somewhat equivocal in that he did not believe that the evidence of such conviction would be as inflammatory as that involving the rape conviction, nevertheless, the objection was propounded. While the court sustained the plaintiffs' counsel's motion to suppress any direct evidence of the 1961 statutory rape conviction, the court did admit some testimony of the circumstances surrounding this crime by allowing the defense to prove that in 1961 Carr brought his 16-year-old girlfriend to the family home and introduced her to his wife, and that during the years 1961-1963, he left his family, lived with the girl, and

failed to support his family. As to the 1967 check conviction, the court admitted evidence of the crime, its surrounding circumstances, and the fact that he served an 11-month Orange County jail sentence therefor.

The first issue requiring resolution is whether the court committed prejudicial error in instructing the jury on the defense of assumption of risk. At the outset, it should be emphasized that *assumption of risk is a narrow defense which should only be permitted in those rare cases where the injured person knowingly exposes himself to an obvious danger.* Assumption of risk is available as a defense where there has been a voluntary acceptance of the dangerous condition or hazard, either express or implied, made with knowledge and appreciation of the risk. (Rest., Torts, § 893.) Where the facts indicate that the plaintiff *must have had knowledge of the hazard,* the situation is equivalent to actual knowledge, and there may be an assumption of the risk, but where it merely appears that he should or could have discovered the danger by the exercise of ordinary care, the defense is contributory negligence, not assumption of risk. (*Hayes* v. *Richfield Oil Corp.,* 38 Cal.2d 375, 385 [240 P.2d 580]; see Prosser on Torts (3d ed. 1964) pp. 454-468.) Assumption of risk is different than contributory negligence and trial courts should be cautious in instructing on the former. Assumption of risk should only be allowed as a defense where there is proof that the plaintiff had *knowledge of the particular risk, appreciated the magnitudë thereof,* and *voluntarily assumed the same. (Prescott* v. *Ralphs Grocery Co.,* 42 Cal.2d 158, 161-162 [265 P.2d 904].) Assumption of risk is based fundamentally on consent. (*Vierra* v. *Fifth Avenue Rental Service,* 60 Cal.2d 266, 271 [32 Cal. Rptr. 193, 383 P.2d 777].)

Because assumption of risk is a limited defense, it is settled that before a jury may be instructed on the doctrine, there must be evidence not only that the plaintiff knew he was stepping into a place of danger but that he also had actual knowledge of the *specific danger* involved. (*Vierra* v. *Fifth Avenue Rental Service, supra,* 60 Cal.2d 266, 270-271; *Grey* v. *Fibreboard Paper Products Co.,* 65 Cal.2d 240, 244 [53 Cal.Rptr. 545, 418 P.2d 153].) Assumption of risk requires the injured person to have *actual,* rather than *constructive, knowledge of the particular danger. (Sperling* v. *Hatch,* 10 Cal.App.3d 54, 61 [88 Cal.Rptr. 704].)

In the case under review, the telephone company maintains that the huge eucalyptus tree laying prone on its wires necessarily presented a dangerous situation to anyone who observed it, and that Carr was an experienced tree trimmer who knew he was confronted with a dangerous situation and, notwithstanding his knowledge of the potential danger, re-

fused the offer of help from his own employer or any assistance from the telephone linemen. In sum and substance, defendant maintains that Carr knew that the undertaking was dangerous but nevertheless assumed the risk incident thereto.

While it may be conceded that a fallen tree laying astride a telephone or electrical line presents an inherently dangerous condition in itself, in that there is always a distinct possibility that the wires could break and snap from the weight of the tree, injuring a workman or bystander, or that a live wire could present a serious hazard, these obvious dangers did *not* result in Carr's death. Knowledge of the *specific* risk which ultimately causes the injury or death is the watchword of assumption of risk; ordinarily, the plaintiff will not be taken to assume any risk or condition flowing from activities of which he is ignorant; furthermore, the plaintiff must not only know of the facts which create the danger, but he must comprehend and appreciate the danger itself. (Prosser on Torts (3d ed. 1964) pp. 461-468.) Carr had a right to assume that the telephone linemen would perform their duty to secure the cable by tying it in such a manner that it would not create tension or cause the uncut portion of the tree trunk to hurtle through the air like a bean projected from a slingshot. There is absolutely no evidence that Carr knew of the specific danger which ultimately resulted in his injury and death.

Carr had a right to assume that the linemen had properly secured the lines in such a manner that they would remain in place until the tree trunk had been entirely removed from the cable. (See *Johnston* v. *Orlando,* 131 Cal.App.2d 705, 708-711 [281 P.2d 357].) One lineman testified the purpose of tying the cable down was to prevent the cable from going up in the air and taking the tree with it. A second lineman testified the rope was tied around the cable and fastened to two standing trees in order to prevent the cable from springing up in the air. Nowhere in the record does it appear that the decedent knew or that he must have known that the trunk was apt to spring from the cable into the air and plummet down upon him or anyone else. Carr did not consent to relieve the telephone company and its employees of the obligation to firmly secure the telephone cable, and there is no evidence indicating that he was actually aware of the fact that the lines had not been sufficiently secured to prevent them from springing into the air as a result of tension. To the contrary, the evidence reflects that no danger was to be anticipated from the tree trunk itself. (See *Guerrero* v. *Westgate Lumber Co.,* 164 Cal.App.2d 612, 617 [331 P.2d 107].) Consequently, Carr did not assume the danger of the fallen tree trunk flying in the air as a result of the tension imposed on the wires.

It is reversible error to instruct on assumption of risk when there are insufficient facts warranting invocation of the doctrine; the error is prejudicial inasmuch as it cannot be determined on appeal whether the jury based its verdict on assumption of risk or contributory negligence; even if there was evidence of contributory negligence, the assumption of risk instruction cannot be said to be superfluous unless contributory negligence was shown as a matter of law. (*Vierra* v. *Fifth Avenue Rental Service, supra,* 60 Cal.2d 266, 273-275; *Hartlerode* v. *Edwardsen,* 219 Cal.App.2d 517, 521-522 [33 Cal.Rptr. 346]; *Dutcher* v. *City of Santa Rosa Sch. Dist.,* 156 Cal.App.2d 256, 262 [319 P.2d 14].)

The foregoing rationale is peculiarly applicable to this case. Here, the court instructed on both defenses. There can be no question the instructions influenced the defense verdict inasmuch as the jury returned during deliberations and the foreman requested that the instructions on contributory negligence and assumption of risk be reread. Consequently, the judgment must be reversed.

Although the foregoing determination is dispositive of the appeal, it is deemed advisable to undertake some discussion of the remaining issue inasmuch as evidence of Carr's character may be offered on retrial.

■ Defendant offered evidence of Carr's character (his having left his family to live with a young girl in 1961-1963, and his conviction in 1967 for issuing checks without sufficient funds) on the basis that such information was relevant to damages. ■ California law provides that relevant character evidence is admissible in civil cases, except in those situations where it is offered to prove conduct, or quality of conduct, on a specific occasion. (Evid. Code, § § 1100, 1101, 1104.) Since the proffered evidence did not relate to the decedent's conduct or the quality of his conduct, the only question is whether or not it was relevant. Evidence of a person's character or a trait of his character is relevant in three situations: (1) When offered on the issue of his credibility as a witness; (2) when offered as circumstantial evidence of his conduct in conformity with such character or trait of character; and (3) when his character or a trait of his character is an ultimate fact in dispute in the action. (Comment, Law Rev. Com., Evid. Code, § 1100.) ■ Defendant urges that the aforesaid character evidence was relevant to prove an ultimate fact in dispute, to wit, that evidence of the decedent's character was essential in order to determine the proper amount of damages for his wrongful death.

The only statutory authority for an award of damages in wrongful death cases is the provision that the trier-of-fact may award such damages as, under all the circumstances of the case, may be just. (Code Civ. Proc., § 377.) Case law has further defined wrongful death damages to include the

following three elements: (1) The present value of future contributions from the decedent to his surviving heirs; (2) the value of any personal service, advice or training that probably would have been given; and (3) the value of the decedent's society and companionship. (*Bond* v. *United Railroads,* 159 Cal. 270 [113 P. 366]; 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, p. 1616.) In the case of the death of a husband and father, the chief element is the present value of the earnings he would have contributed to the family during the period of his life expectancy. (*Syah* v. *Johnson,* 247 Cal.App.2d 534, 547 [55 Cal.Rptr. 741].) These damages are in addition to the recovery which may be sought by the decedent's estate pursuant to the provisions of section 573 of the Probate Code. (Code Civ. Proc., § 377.) The law does not allow recovery for pain or suffering resulting to the deceased or his dependents. (*Clough* v. *Steen,* 3 Cal.App.2d 392, 394 [39 P.2d 889].)

The telephone company maintains that evidence of Carr's extramarital affair and his bad-check conviction was relevant to the damage issue for the purpose of showing the decedent was unlikely to remain with the family and support them or provide them with any companionship. Granting that a defendant in a wrongful death action should be able to show that the breadwinner has not always lived with and supported his family faithfully in the past, this objective could be accomplished without going into the potentially inflammatory incidents allowed herein. It would have been simple to establish that the decedent left his wife and children for a period of three years in 1961-1963 and did not provide for their support during that time, without referring to the fact that his reason for leaving was to live with a minor girl. Similarly, nonsupport of his famliy during the 1967 incarceration could have been proved without reference to the deceased's conviction and sentence by merely inquiring as to whether he supported his dependents during 1967-1968. While nonsupport may be relevant to the issue of damages, the details are of such slight value and such great prejudicial effect that they would likely distract the jury from the main issues. (See Evid. Code, § 352.) In the event any witness falsely or incorrectly maintained that the deceased contributed to his family's support during the aforesaid years, then details as to the decedent's activities could be offered for impeachment purposes.

As to the contention that Carr's moral indiscretions were relevant to show the value of his companionship to his widow, there is authority for the proposition that plaintiff, by seeking damages for pecuniary loss resulting by reason of her husband's death, tenders an issue as to the relationship between deceased and herself. (See *Benwell* v. *Dean,* 249 Cal.App.2d 345, 353 [57 Cal.Rptr. 394].) However, *Benwell* concerned evidence of

marital discord immediately preceding the death of the husband. The 1961-1963 activities of the decedent herein were so remote from his family relationship at the time of his death in 1970 as to be more prejudicial than probative, and the evidence should be excluded upon retrial. (See Evid. Code, § 352.)

In conclusion it should be noted that defendant's reliance on *Syah* v. *Johnson, supra,* 247 Cal.App.2d 534, is misplaced. Although substantial evidence was introduced in that case concerning the deceased's derelict behavior, the admissibility of that evidence was not contested on appeal; instead, it was urged that the award of $30,000 for wrongful death damages was excessive in light of the evidence of decedent's dissolute character; inasmuch as the judgment was affirmed, the decision would actually tend to show that character evidence is of minimal utility in measuring wrongful death damages.

The judgment is reversed.

Gabbert, J., concurred.

**GARDNER, P. J.**—I dissent.

As this court said in *Sand* v. *Mahnan,* 248 Cal.App.2d 679 [56 Cal. Rptr. 691], ". . . it is not error to give an instruction on a theory advanced by a party if there is any evidence at all on which to base it, although this evidence may be slight or inconclusive. [Citations.] The question is whether the record contains any evidence, including inferences to be drawn from the circumstances, that plaintiff knew and appreciated the danger. [Citations.]" (*Sand* v. *Mahnan, supra,* p. 687.)

In my opinion, the record in this case contains sufficient evidence from which a reasonable inference may be drawn that from Carr's knowledge and observations he knew and appreciated the danger involved in his undertaking. Therefore, the instruction on assumption of risk was proper.

I also feel that the evidence of the decedent's background was properly received.

In the first place, the only objection to a prior conviction on the ground that it was inflammatory was that made as to the rape conviction. That objection was sustained. Insofar as the check conviction was concerned, the only objection made to this was that it was not a felony because the dece-

dent drew county time. No ruling was made on this issue and none was called for since counsel for the plaintiffs presented evidence of the check conviction and the fact that Carr spent time in jail as the result of this conviction. Additionally, the plaintiffs' attorney brought up Carr's extramarital activities on direct examination of the widow. It is basic that when inadmissible evidence is offered there must be an objection at the time of trial or it may not be raised on appeal. Failure to object at all waives the defect. (Witkin, Cal. Evidence (2d ed. 1966) § 1285, p. 1188.) Thus, insofar as the check conviction and Carr's extramarital activities are concerned, the matters were brought out by plaintiffs' counsel and, in addition, there was no objection made concerning the extramarital activities. In this respect, counsel said, "There is going to be some offer of proof, I understand, that there was another woman, and if his Honor feels that is admissible, that doesn't concern me too much, I can cover that without any difficulty, but the prior statutory rape felony I think is so highly prejudicial that the jurors just couldn't forget it." Thereafter, as indicated, the trial judge sustained the objection to the statutory rape and the plaintiff himself brought out the matters now complained of.

Secondly, under the authority stated by the majority, the evidence of Carr's extramarital affairs, his bad check conviction, and his time in custody on both charges were admissible, even though objection had been made thereto. I find nothing so dreadfully inflammable or inherently improper in telling the jury the truth.

The majority suggests that the jury merely be advised that the defendant was missing for the years he was in custody. (On a secret peace mission for the United Nations? Exploring the upper regions of the Amazon? A medical missionary in the jungles of New Guinea? A prisoner of war?)

A defendant, even a rich, soulless corporation, is entitled to show the disposition of the decedent to contribute financially to support his heirs and to show his earning capacity and his habits of industry and thrift since all have a bearing on the value of his life to his wife and family. (*McDonald v. Price,* 80 Cal.App.2d 150 [181 P.2d 115].) If the decedent had been a hard-working, law-abiding citizen and a paragon of all the virtues of honesty, thrift and probity who supported his wife and children and afforded them a stable home, the plaintiff would be entitled to so prove. If, on the other hand, he was an irresponsible, philandering, check-kiting jailbird, the jury would be entitled to so know. The jury is entitled to the whole picture—warts, wrinkles and all—not a sterilized, unreal, retouched portrait which amounts only to a shadowy silhouette of the real man. As Mr.

Moto, that well-known Japanese philosopher of the 1930's once said, "Candor are a lovely virtue."

I would affirm the judgment.