[Civ. No. 42067. Second Dist., Div. Five. June 25, 1974.]

ELMER DELL TIMMONS, Plaintiff and Respondent, v.
ASSEMBLY OF GOD CHURCH OF VAN NUYS NO. 212,
Defendant and Appellant.

**COUNSEL**

Cooksey, Coleman & Howard and Paul Cooksey for Defendant and Appellant.

Stanley & Bin, Lowen H. Stanley, Lascher & Rader and Edward L. Lascher for Plaintiff and Respondent.

## OPINION

**LORING, J.**[*]—Respondent Elmer Dell Timmons (Timmons) filed a second amended complaint against appellant Assembly of God Church of Van Nuys, No. 212, a non-profit corporation (hereafter Church) and others, for damages for personal injuries proximately caused by appellant's negligence. After jury trial a verdict was rendered in favor of respondent against appellant Church for $65,000, and judgment was entered accordingly. The motions of Church for judgment notwithstanding the verdict and for a new trial were denied. Appellant Church appeals from the judgment, from the order denying its motion for new trial and from the order denying its motion for judgment notwithstanding the verdict. The order denying appellant's motion for new trial is nonappealable and will be hereinafter dismissed.

### CONTENTIONS

Appellant's contentions may be briefly summarized as follows:

1. Church had no legal duty to Timmons since they were engaged in a joint enterprise.

2. Church was not negligent as a matter of law.

3. The trial court committed prejudicial error in refusing to give a requested instruction on assumption of risk.

### FACTS

Church was engaged in constructing and paving a concrete parking lot adjacent to its Church building for the use of its members and visitors. At each Sunday service the pastor would request male members of the congregation to voluntarily donate their services in providing the manual labor. The Church supplied the materials. Female members of the Church supplied free food and refreshments. Timmons, a Church member, volunteered his services on Sunday, August 10, 1968, and on Sunday, August 17, 1968. On each of those two dates, William Gregorchuck, a Church member, who was a carpenter, "was the supervisor on the job." He was experienced in building forms for concrete, but was not a licensed contractor. Other Church members reported to Gregorchuck who assigned the work. He corrected anything done erroneously. Timmons assisted Wayne Brillhart, another Church volunteer, in cutting re-enforcing wire used in the concrete. The wire was cut from rolls into 20-foot lengths. Nobody gave instructions as to how the work was to be done and no

---

[*]Assigned by the Chairman of the Judicial Council.

safety goggles were provided. Timmons and Brillhart would weigh down the roll of wire with stones at one end and then one of the men would stand on the wire at the point where it was to be cut and the other man would cut the wire. This was the procedure followed on August 10, 1968, and August 17, 1968. On August 17, 1968, Timmons and Brillhart started working together but Brillhart was called away and Tim Wilhelm, a 14-year-old Church volunteer, was assigned to replace Brillhart standing on the wire while Timmons cut it. The purpose of placing the rocks to weigh down the wire at one end and have someone stand on the wire at the point where it was cut was to keep the wire from recoiling. On August 17, 1968, Timmons had reported to Gregorchuck, who gave him a pair of wire cutters and told him to cut wire. No safety goggles or safety instructions were given. After Wilhelm had helped Timmons for a little while, he, apparently, walked away as Timmons was cutting the wire. When the last cut was made the wire recoiled and flew up hitting Timmons in the eye. Timmons was taken to the hospital and ultimately the eye was removed. Appellant does not claim that the amount of the jury's verdict was excessive.

## DISCUSSION

■ In reliance on *Coleman* v. *California Y. Meeting, etc.,* 27 Cal. App.2d 579 [81 P.2d 469], appellant argues that since Timmons was engaged in a joint enterprise with Church, Church owed Timmons no legal duty of due care. In our view the later case of *Fernquist* v. *San Francisco Presbytery,* 152 Cal.App.2d 405 [313 P.2d 192], correctly states the law applicable to this case, when the court, at page 410, said: "Defendant's contention seems to be that this was a joint venture and that there is no such duty of care owing from one joint venturer to another joint venturer. Whether they were joint venturers or not seems beside the point. In a controversy between joint venturers the doctrine of imputed negligence from the one to the other does not obtain. (*Roberts* v. *Craig,* 124 Cal.App.2d 202, 208-210 [268 P.2d 500, 43 A.L.R.2d 1146].) The important question is: Which one of them was in control or were both in control? (*Walker* v. *Adamson,* 9 Cal.2d 287, 290 [70 P.2d 914].) Here, the evidence supports an implied finding that the defendant, not the plaintiff, had control over the placing of the rafters across the center-board and the top plate, in readiness for use by plaintiff and Rennison.

"Defendant's chief reliance is upon *Coleman* v. *California Y. Meeting, etc. Church,* 27 Cal.App.2d 579 [81 P.2d 469]. The court in that case did speak of a joint enterprise and said that this relationship, 'coupled with the circumstances surrounding the accident,' rendered the court 'unable to perceive the existence of any duty reposing upon respondent the

violation of which resulted in injury to appellant.' (P. 582.) We are not told in detail what those 'circumstances' were. It would seem reasonable to infer that they showed that the plaintiff was sufficiently in control of the situation or aware of the risk to be responsible or to share responsibility for the accident."

In *Roberts* v. *Craig,* 124 Cal.App.2d 202 [268 P.2d 500], the court said at pages 209-210: "There is another complete answer to this contention. Not only were the parties not in fact joint venturers, but even if they were, the negligence of appellant would not be imputed to respondent so as to bar her cause of action against appellant. The doctrine of imputed negligence is indulged in to protect third persons from loss caused by the joint enterprise. Liability is imposed on all members engaged in a joint enterprise when the action is brought by a third person because the courts have felt that in such a case fairness requires that the joint enterprise should bear the damages caused by the negligence of any member of the enterprise. But this basic cause for the imputation of the negligence of one to another does not exist when one member of the joint enterprise sues another. The better reasoned cases hold that the doctrine of imputed negligence will not be indulged in where the action is between members of the joint enterprise. Dean Prosser, in his well-reasoned text on Torts, states (p. 496): 'A few courts, entirely mistaking the nature of the vicarious liability in the joint enterprise cases, have held that the negligence of the driver is to be imputed to the passenger to bar recovery even when he brings his action against the negligent driver himself. There seems to be no possible justification for such a result. It is well settled that the vicarious liability which is designed for the protection of third persons against the risk of the enterprise does not extend to any action between the parties themselves, and that a negligent servant will be liable to his master, or one member of a partnership to another. Most of the courts which have considered the question have recognized this, and have held that the driver's negligence, which is itself the cause of action, will not bar the passenger's recovery.'" (See also, 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, p. 1541.)

We conclude that there was evidence from which the jury could conclude that this was not a joint enterprise and that Church was in active control of the work, but even if it were a joint enterprise, Timmons would not be barred from recovery for damages sustained as the result of the negligence of Church.

■ We next consider appellant's claim that the trial court committed error in refusing to give the jury two requested instructions on assump-

tion of risk. Appellant requested the court to give the jury BAJI No. 4.30[1] and BAJI No. 4.31[2] which the court refused to give. In the margin we set forth evidence produced by Timmons which might have justified such instructions.[3]

---

[1]"BAJI 4.30

"Assumption of Risk—General Rule

"If plaintiff assumed the risk [of harm] from . . . . . . . . . . . . . . . ., he may not recover damages for an injury resulting therefrom.

"In order for plaintiff to have assumed such risk, he must have had actual knowledge of the particular danger and an appreciation of the risk involved and the magnitude thereof, and must thereafter have voluntarily assumed such risk.

"For a person to act voluntarily he must have freedom of choice. This freedom of choice must come from circumstances that provide him a reasonable opportunity, without violating any legal or moral duty, to safely refuse to expose himself to the danger in question.

"In determining whether the plaintiff assumed such risk, you may consider his maturity, intelligence, experience and capacity, along with all the other surrounding circumstances as shown by the evidence."

[2]"BAJI 4.31

"Assumption of Risk and Contributory

Negligence Compared

"While the same conduct on the part of the plaintiff may amount to both assumption of risk and contributory negligence, there is a distinction between the two defenses. An essential factor in contributory negligence is that it contribute as a [legal] [proximate] cause of the injury. Assumption of risk, however, if it meets the requirements stated to you, will bar recovery of damages although it plays no part in causing the accident except merely to expose the person to danger."

[3]Timmons testified as follows:

"Q. Now, as you were cutting this wire did you have an occasion to place any rocks on the wire here in addition to having someone standing there on it?

"A. We might have, sir. I don't remember exactly, because there wouldn't be any need for it, because one us of would be standing on the wire. I was standing on the wire.

" . . . . . . . . . . . . . . . . . . . .

"Q. And after Tim Wilhelm started to help you in standing on the wire, how many cuts did you make?

"A. I believe about two—not very many.

"Q. Would he stand on the wire in the same manner that you had been standing on it while Mr. Brillhart had done the cutting?

"A. Yes, sir.

"Q. And tell us what happened.

"A. Well, we had rolled out the wire and put rocks on the end, 20 or 30 feet away, and then he would stand on the wire while I was cutting it, and as I was cutting it the last time evidently he wasn't standing on the wire, because it flew up and poked in my right eye.

" . . . . . . . . . . . . . . . . . . . .

"Q. Okay. Now, then, while you were working on the wire you knew that the wire

However BAJI No. 4.31 was meaningless without BAJI No. 4.30 and appellant did not fill in the blank space in BAJI No. 4.30 to specify with particularity the risk which Timmons allegedly assumed which would

---

would have spring or resiliency because you were laying it out in an opposite manner from which it was rolled, didn't you?

"A. Yes, sir, I'm sure we saw that. I can't remember then knowing this, but I am sure, as I think now, we should have known it.

"

"Q. And then on the end that was open, that was away from the bale, down here, you would lay rocks on that to hold it down?

"A. Yes, sir.

"Q. And you knew from that, I assume, that if you didn't lay rocks on that, it would spring back, didn't you?

"A. Yes, sir.

"Q. Now, you told me that—or I believe that you told us that you did not have rocks on the wire up near the bale?

"A. Not when somebody was holding it; there would be no need for rocks.

"Q. Okay. If somebody was up there standing to hold it down, you wouldn't need any rocks on the bale end of the wire on the ground; right?

"A. Yes, sir, that's correct.

"Q. But if somebody was not there to hold it down you knew that you had to have some rocks or something else holding it down, didn't you?

"A. Yes, sir, I presume so.

"Q. And, as a matter of fact, there were times when there wasn't anybody there when you did have rocks holding down the wire up near the bale end, weren't there?

"A. Yes, sir, I remember about 20 minutes or half an hour when I worked myself.

"Q. All right. When was that; was that August the 10th or the 17th?

"A. That was the 17th when Mr. Brillhart was called away.

"

"Q. And you knew that if you didn't have rocks holding that down and you cut it, it was going to spring up; right?

"A. Yes, sir.

"Q. So you would have rocks about so (indicating) when there wasn't anybody standing up there; right?

"A. Yes, something like that.

"

"Q. And then Tim Wilhelm went off to some other place; right?

"A. Yes, sir.

"Q. And after Tim Wilhelm went off you forgot to lay rocks back on the wire down at the bale end; isn't that right?

"A. Well, I can't say as I remember back—I can't say he didn't help me lay down that particular wire, and he took off—so, sir, I don't really remember.

"Q. Let us see, Mr. Timmons, if we can—realizing again it has been over four years now—

"A. Yes, sir.

"Q. Reading from your deposition, page 26, line 13 through page 27, line 19:

" 'Q. So that the wire would have some spring resiliency because of the fact that you were laying it out in an opposite manner than it was rolled; is that right?

" 'A. Yes.

" 'Q. How would you hold the end that was opposite first before cutting it?

" 'A. I had been laying rocks on it, but a friend helped me out for about 20 minutes, and then I forgot to lay rocks on it after that.

" 'Q. What?

" 'A. Then I had forgot to lay rocks on it after that because he had been helping

bar his recovery. The definition of that risk was critical. Respondent correctly argues that the law is well settled that the court may refuse to give a requested instruction when the blank spaces are not filled in. (*Shaw* v. *Pacific Greyhound Lines,* 50 Cal.2d 153, 158 [323 P.2d 391]; *Mapes* v. *Yowell,* 54 Cal.2d 231, 234 [5 Cal.Rptr. 159, 352 P.2d 527, 87 A.L.R.2d 536].) In the case at bar after the evidence was completed and court and counsel discussed the instructions which the court intended to give, the following transpired:

"MR. COOKSEY:  Your Honor, may I inquire as to why the Court is not giving an assumption-of-risk instruction?

"THE COURT:  I don't think it applies. I am giving contributory negligence, but this is not an assumption of a known risk.

"MR. COOKSEY:  I think that the evidence is substantial that he appreciated the hazard.

"THE COURT:  The hazard involved—For an assumption of risk it has to be entirely different than just knowing that there are tools involved.

"MR. COOKSEY:  No; knowing that the wire had resiliency and spring.

"THE COURT:  I can't see that as an assumption of risk. No. I'm not going to give that instruction. I will give the contributory negligence, which is essentially the same, under these circumstances anyway.

---

me, and I didn't have to lay them down.

" 'Q. How would you hold that end down, by the bale end, where you were doing the cutting?

" 'A. The bale end would be held down by rocks also.

" 'Q. Then would you cut close to the rocks by the bale end?

" 'A. Yes.'

"Then continuing on page 28, line 6 through 26:

" 'Q. Which portion of the wire, the wire away from the bale end or closer to the bale end, went into your eye?

" 'A. The wire sprung up away from the bale.

" 'Q. That would have normally been held down by rocks?

" 'A. Yes, or someone holding it.

" 'Q. Was it just a question of you having someone down there to hold the wire? Was this a question of you forgetting to have somebody there to put rocks on the wire down at the other end?

" 'A. Yes. I was used to him helping me and he walked off to see what his friend was doing.

" 'Q. Who is "him"?

" 'A. Tim Wilhelm.

" 'Q. Tim Wilhelm had been holding the wire down and he walked off?

" 'A. Yes.

" 'Q. How long after he walked off did this accident happen?

" 'A. Not long at all. I think it was the very next piece that sprung up because I was just having someone hold it.' "

"MR. COOKSEY: May we see the instructions the Court is going to give?"

We conclude that under these circumstances the rule enunciated in *Grey* v. *Fibreboard Paper Products Co.,* 65 Cal.2d 240 [53 Cal.Rptr. 545, 418 P.2d 153][4] is applicable. There the court at pages 245 and 246 said: ". . . In short, there was evidence which would have justified a finding that plaintiff had *actual knowledge of the specific risk* he faced, but elected to proceed despite that knowledge. The instruction then, should have been given. However, it remains to be determined whether the error in failing to so instruct was prejudicial in view of the instruction given on contributory negligence.

"While contributory negligence and assumption of risk are two different legal doctrines, one being based on a failure to exercise due care in the circumstances and the other being based upon voluntary exposure to a known risk, it is nevertheless true that the two doctrines overlap in many situations. The commentators universally recognize that the term 'assumption of risk' has been used by the courts to describe several kinds of situations whose real differences should demand different kinds of treatment. To simplify greatly, it has been observed (see 2 Harper and James, The Law of Torts, p. 1162 et seq.; Prosser, Handbook of Law of Torts (3d ed.) p. 450 et seq.) that in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence which may be defined as follows: '. . . conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause cooperating with the negligence of the defendant in bringing about the plaintiff's harm.' (Rest. 2d Torts, § 463, p. 506.) Other kinds of situations within the doctrine of assumption of risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him. Such a situation would not involve contributory negligence, but rather a reduction of defendant's duty of care.

"It is evident that the instant case presents an example of the first of the foregoing situations. The testimony presented would support, but not compel, a finding that plainitff unreasonably proceeded in a situation of known danger. As such, the 'assumption of risk' here involved is but a variant of contributory negligence, and as the jurors were instructed, in

---

[4]*Grey* v. *Fibreboard Paper Products Co.,* and other cases to like effect, hereinafter referred to, were not cited by respondent in his briefs.

effect, that plaintiff could not recover if his negligence concurred with the negligence of the defendant to contribute in some degree in proximately causing the damage, no prejudice is demonstrated. The jurors necessarily determined that plaintiff was not negligent in any degree; in other words, that his conduct did not fall 'below the standard to which he should conform for his own protection,' and was not a 'contributing cause co-operating with the negligence of the defendant in bringing about the' harm. Thus, the jurors absolved plaintiff of any misconduct in jeopardizing his well-being, and necessarily determined that he did not unreasonably undertake to encounter a specific known risk, the prerequisite upon which the particular defense of assumption of risk must be based.

"Although it was error not to instruct the jurors on the doctrine of assumption of risk, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. Accordingly, there has been no miscarriage of justice. (Cal Const., art. VI, § 4½ ; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)"

In *Gyerman* v. *United States Lines Co.,* 7 Cal.3d 488 [102 Cal.Rptr. 795, 498 P.2d 1043], the Supreme Court in explaining the difference between contributory negligence and assumption of risk said at page 498, footnote 10: ". . . Plaintiff is not charged with accepting a known risk created by defendant's conduct, but rather with violating a duty of care to himself by his own omission. In assumption of the risk the negligent party's liability is negated by the injured party's voluntary and knowledgeable acceptance of a risk. The contributory negligence defense bars recovery by the injured party not because of consent, but rather because he, too, has breached a duty of due care which proximately caused the injury."

This language is particularly pertinent to the case at bar because the evidence would not support a conclusion that Timmons consented to an act of negligence or breach of duty by appellant, but rather that he violated a duty of care to himself by his own omission—failing to place rocks on the wire or by failing to have someone stand on the wire. The jury by its finding in favor of respondent presumably concluded that momentary forgetfulness under the circumstances was not the conduct of a negligent person. The jury must have concluded that Timmons acted as a reasonable and prudent person.

In *Dorobek* v. *Ride-A-While Stables,* 262 Cal.App.2d 554 [68 Cal. Rptr. 774], a jury returned a verdict in favor of plaintiff who sustained injuries on a fall from a rented horse. Defendant complained that the trial court should have given an instruction on assumption of risk be-

cause the evidence showed that plaintiff continued to ride the horse after knowledge that it was headstrong and spirited. In affirming judgment the court in reliance on *Grey* v. *Fibreboard, supra,* concluded that the refusal to give the instruction was not prejudicial in view of the fact that the jury had been fully instructed on contributory negligence.

In the case of *Carr* v. *Pacific Tel. Co.,* 26 Cal.App.3d 537 [103 Cal. Rptr. 120] (a case more directly in point) Carr was killed while in the process of removing a tree which had fallen on telephone, television and electric wires. The telephone crew had tied the telephone lines in such a way that after Carr had removed a portion of the tree, "the remainder of the tree trunk was flung into the air as a result of the tension created by the telephone wires." The trial court, inter alia, gave instructions on assumption of risk. The jury rendered a defense verdict. The appellate court reversed saying at page 542: "The first issue requiring resolution is whether the court committed prejudicial error in instructing the jury on the defense of assumption of risk. At the outset, it should be emphasized that *assumption of risk is a narrow defense which should only be permitted in those rare cases where the injured person knowingly exposes himself to an obvious danger.* Assumption of risk is available as a defense where there has been a voluntary acceptance of the dangerous condition or hazard, either express or implied, made with knowledge and appreciation of the risk. (Rest., Torts, § 893.) Where the facts indicate that the plaintiff *must have had knowledge of the hazard,* the situation is equivalent to actual knowledge, and there may be an assumption of the risk, but where it merely appears that he should or could have discovered the danger by the exercise of ordinary care, the defense is contributory negligence, not assumption of risk. (*Hayes* v. *Richfield Oil Corp.,* 38 Cal.2d 375, 385 [240 P.2d 580]; see Prosser on Torts (3d ed. 1964) pp. 454-468.) Assumption of risk is different than contributory negligence and trial courts should be cautious in instructing on the former. Assumption of risk should only be allowed as a defense where there is proof that the plaintiff had *knowledge of the particular risk, appreciated the magnitude thereof,* and *voluntarily assumed the same.* (*Prescott* v. *Ralphs Grocery Co.,* 42 Cal.2d 158, 161-162 [265 P.2d 904].) Assumption of risk is based fundamentally on consent. (*Vierra* v. *Fifth Avenue Rental Service,* 60 Cal.2d 266, 271 [32 Cal.Rptr. 193, 383 P.2d 777].)

"Because assumption of risk is a limited defense, it is settled that before a jury may be instructed on the doctrine, there must be evidence not only that the plaintiff knew he was stepping into a place of danger but that he also had actual knowledge of the *specific danger* involved. (*Vierra* v. *Fifth Avenue Rental Service, supra,* 60 Cal.2d 266, 270-271; *Grey* v. *Fibre-*

*board Paper Products Co.,* 65 Cal.2d 240, 244 [53 Cal.Rptr. 545, 418 P.2d 153].) Assumption of risk requires the injured person to have *actual,* rather than *constructive, knowledge of the particular danger."*

We believe that in the case at bar the most damaging portion of the evidence, from respondent's point of view, was his own admission that he "forgot" to lay rocks on the wire after Wilhelm walked off, but this merely establishes that "he should or could have discovered the danger by the exercise of ordinary care." That might well constitute contributory negligence but it falls far short of proving that he "knew he was stepping into a place of danger" with "actual knowledge of the specific danger involved."

We conclude, under all of the circumstances, that it was not prejudicial error to refuse the instructions on assumption of risk.

The purported appeal from the order denying defendant's motion for new trial is dismissed. The order denying defendant's motion for judgment notwithstanding the verdict is affirmed. The judgment is affirmed.

Ashby, Acting P. J., and Hastings, J., concurred.