[S.F. No. 23593. Jan. 6, 1978.]

ROBERT A. EWING, a Minor, etc., et al.,
Plaintiffs and Appellants, v.
CLOVERLEAF BOWL, Defendant and Respondent.

**COUNSEL**

Bruce I. Cornblum and Charles McCrory for Plaintiffs and Appellants.

Allan F. Grossman, Judith Ilene Bloom, Rosen, Rosen & Leavitt and Alan Dodd Rosen as Amici Curiae on behalf of Plaintiffs and Appellants.

Woodrow W. Kitchel and Richard G. Logan for Defendant and Respondent.

Raoul D. Kennedy, Mike C. Buckley and Stevan C. Kalmon as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**TOBRINER, J.**—In this case, an experienced bartender, knowing that a patron had just turned 21 years of age that very day, served his young customer 10 straight shots of 151 proof rum, as well as a vodka collins and 2 beer chasers, during a period of less than an hour and a half; as a result, the 21-year-old patron died the next day, leaving 2 small children on whose behalf the instant wrongful death action was brought.

Faced with these undisputed facts, the trial court granted defendant's motion for nonsuit, finding as a matter of *law*, that the patron's conduct amounted to contributory negligence and that the bartender's conduct did not constitute willful misconduct. We shall explain that this ruling represents an illogical and unwarranted limitation of this court's holding in *Vesely* v. *Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151], and improperly immunizes a bartender from all responsibility for a

senseless death that the jury could have found foreseeably flowed from the bartender's reckless conduct.

### 1. *The facts in this case.*

In this wrongful death action, Robert and Anthony Ewing, the sons of the decedent, Christopher Ewing, brought suit through their mother and guardian ad litem, Katherine Ewing, against Cloverleaf Bowl, a California corporation. At the close of plaintiffs' presentation of evidence, the trial court granted defendant's motion for nonsuit, dismissed the jury, and entered judgment for defendant. Plaintiffs appeal.[1]

■ In stating and assessing the facts in this case, we are guided by the traditional rule that a trial court may grant a defendant's motion for nonsuit only if plaintiffs' evidence would not support a jury verdict in plaintiffs' favor. (*Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 469 [85 Cal.Rptr. 629, 467 P.2d 229]; *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84]; *Estate of Caspar* (1916) 172 Cal. 147, 150 [155 P. 631].) "[T]he evidence most favorable to [plaintiffs] must be accepted as true." (*Taylor* v. *Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 117 [52 Cal.Rptr. 561, 416 P.2d 793]; see 4 Witkin, Cal. Procedure (2d ed. 1971) § 353, p. 3152.) ■ Accordingly, we give "to the plaintiffs' evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor. . . ." (*Elmore* v. *American Motors Corp., supra.*) We disregard "conflicting evidence" (*Estate of Caspar, supra*), and inquire whether the evidence, if "viewed favorably to [plaintiffs'] cause, was sufficient to support a jury verdict" in their favor. (*Pike* v. *Frank G. Hough Co., supra.*)

Bearing these guidelines in mind, we turn to the facts. Christopher Ewing celebrated his 21st birthday on April 13, 1971. Early that evening, Jerry Powers joined Chris and Lloyd Whitlock, fiance of Chris' sister Cindy, in the garage of Chris' parents. Jerry was then a parttime bartender at the Cloverleaf Bowl, a bowling alley in Fremont. Upon learning of Chris' birthday, Jerry suggested that the group go to the Cloverleaf Bowl, and offered to buy Chris a drink. Chris and Lloyd agreed. Jerry, Chris, and Lloyd, accompanied by Chris' sister Loretta

---

[1]Plaintiffs filed their complaint on August 10, 1971. The trial court entered judgment for defendants on January 16, 1975. This is therefore a pre-*Li* action (see *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 829 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]); accordingly, we review the trial court's action through the lens of pre-*Li* law, and not principles of comparative negligence.

and Jean Enos, a friend of Chris, accordingly left for the Cloverleaf Bowl, arriving somewhere between 8:30 and 9 p.m.[2]

There were two bars at the Cloverleaf Bowl. The main bar was in the cocktail lounge, with tables capable of seating 150 people. A second bar, a "service" or "speed" bar, was located outside the cocktail lounge, primarily for the use of bowlers.

On the day of these events Richard Lamont was the only bartender on duty at the Cloverleaf Bowl. Lamont moved back and forth between the two bars. The one cocktail waitress on duty that night, Diane Kerr, recalls that the bowling and cocktail areas were not crowded.

Jerry Powers, Lloyd Whitlock, and Chris Ewing went immediately to the service bar upon arriving at the Cloverleaf Bowl. Loretta Ewing and Jean Enos, because they were not yet 21, did not go to the bar, but rather sat at a table about 10 feet from the bar. Jean Enos had a clear view of the bar from where she sat.

Lamont asked Chris for identification, and, upon discovering that it was Chris' birthday, gave him a vodka collins on the house. After drinking the collins, Chris said, "I'm twenty-one and I'm not even drunk." Jerry Powers replied, "I'll give you something that will make you drunk." Jerry told Lamont to give Chris the strongest drink in the house.

That drink was 151 proof rum. Most of the liquor which Lamont served at the Cloverleaf Bowl was either 86 or 100 proof alcohol. Lamont knew that the difference in proof reflected differences in alcohol content.[3] The Bowl stocked only one or two bottles of 151 proof rum. These were not kept at the service bar, but rather were stored behind the main bar. Lamont therefore had to leave the service bar to get the rum.

Lamont served Chris a shot glass of straight rum. Although a shot glass will hold one ounce of liquid, at the Cloverleaf Bowl, the shot glasses are marked with a white line at the seven-eighths of an ounce level. Ordinarily a bartender would only fill a shot glass up to the line. On this occasion, however, Lamont filled the glass to the brim.

---

[2] Up to this point, Chris had not taken a drink that day, except perhaps for one beer.

[3] One proof equals 1/2 percent alcohol. Two hundred proof liquor, therefore, is 100 percent alcohol.

Before Chris drank the liquor, Lloyd warned him that it was a strong drink. Lamont also said it was a powerful drink. Chris, however, consumed the full shot immediately. Lamont poured another shot. Again, Chris drank the rum at once.

At this point, Diane Kerr, who was watching, attempted to intervene. After Chris drank the second shot, she addressed Jerry Powers: "Jerry, why don't you just wait a few minutes and he'll be drunk." Jerry replied: "It's just for fun. They do it to me all the time."

Jerry Powers had purchased Chris' first two drinks. Lloyd Whitlock bought a third round. Lamont again poured Chris a full ounce of rum. At the same time, however, he warned: "Chris, take it easy on this stuff. It's going to catch up with you and knock you for a loop." Chris drank the third round.

Jean Enos, from her vantage point at the table, had been watching these events with some concern. After finishing the three drinks, Chris came over to the table. Jean told Chris he'd better not get drunk because his mother wouldn't like it. Chris replied, "I'll be all right," and returned to the bar.

Jean watched Chris drink four more glasses of rum. Lamont served each drink. After he poured a shot of rum, he would remove the bottle from the bar; consequently, each time he poured a shot, he would first be required to remove the bottle from its shelf. When Chris next came over to the table, he told Jean he was getting drunk. Jean noticed that his eyes were glassy, his speech slurred, his face red. She said, "You'd better not do that." Again he said, "I'll be all right."

The Cloverleaf Bowl, as a matter of policy, would not serve patrons after they appeared to be intoxicated. Lamont knew of this policy. A sign posted by each cash register proclaimed it. Lamont nonetheless served Chris three more glasses of rum when Chris returned to the bar.[4]

Chris' older brother Doug and his wife Debby stopped at the Cloverleaf Bowl around 10 p.m. They saw Chris standing at the service bar with Jerry. Chris, leaning on the bar, spilled a cup of dice; his speech was slurred, but seeing his brother, he told Lamont: "Let's have another one, one for me and one for my brother." Lamont reached down for a

---

[4] During the course of his drinking, Chris also consumed two beer chasers.

bottle. Doug interrupted: "No, he's had enough. He can't even stand up." Doug walked Chris over to the table. Chris passed out. Doug and Lloyd dragged him out of the Cloverleaf Bowl.

Doug and Lloyd put Chris in Jerry Powers' car. Jerry took Chris back to the home of his mother and stepfather. Jerry and Chris' stepfather carried Chris inside. Chris was unconscious. The next morning Chris' mother discovered that he was dead.

Dr. Allan McNie took a sample of Christopher Ewing's blood at the time of the autopsy. He found that the level of alcohol in the blood sample was .47 percent. As Dr. McNie subsequently testified, alcohol acts as a depressant on the central nervous system. If the level of alcohol in a person's blood exceeds .20 percent a casual observer will be able to detect signs that the person is drunk. If the level of alcohol is between .30 and .40 percent, the person will begin to become comatose. If the level of alcohol exceeds .42 percent, the person will die as a result of paralysis of the centers of the brain controlling heart rhythm and respiration. Dr. McNie concluded that Chris Ewing died of acute alcohol poisoning.

Dr. McNie calculated the amount of liquor Chris must have consumed in order to achieve an alcohol level of .47 percent. Taking into account Chris' weight, the amount of food he had eaten, and other factors, Dr. McNie found that Chris must have drunk 21.6 ounces of 86 proof liquor, 18.6 ounces of 100 proof liquor, or 11.2 ounces of 151 proof liquor.

Christopher Ewing's sons, in bringing this wrongful death action, charged the Cloverleaf Bowl with both negligence and willful misconduct.[5] In our review of the trial court's nonsuit, we shall assess plaintiffs' allegations against the background of the facts which we have set forth above. Specifically, we shall consider three issues: whether defendant, as represented by its bartender, owed a duty of care to Christopher Ewing, its customer; whether a jury could reasonably conclude that the bartender's conduct amounted to willful misconduct in breach of that duty; and whether a jury could also reasonably conclude that Ewing's

---

[5]Originally, plaintiffs also sought punitive damages. They dropped their punitive damages claim at trial.

Defendant argues that plaintiffs alleged their willful misconduct theory only in that part of the complaint which addressed the question of punitive damages. Even if defendant is correct (and we note that the complaint does at least refer to "reckless" conduct), and even if plaintiffs thus erred as a matter of pleading, defendant's argument is irrelevant on appeal since defendant asserts no prejudice. (See *Buxbom* v. *Smith* (1944) 23 Cal.2d 535, 542-543 [145 P.2d 305].)

conduct, even if it did constitute contributory negligence, nonetheless amounted to neither willful misconduct nor assumption of the risk.[6]

2. *A bartender owes a duty to a patron to exercise due care and incurs liability to the patron for the foreseeable injuries caused by the bartender's failure to exercise such care.*

■ The courts of this state have followed the general rule that a person is liable for the reasonably foreseeable injuries caused by his failure to exercise reasonable care. (*Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399 [115 Cal.Rptr. 765, 525 P.2d 669]; *Dillon v. Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; *Hilyar v. Union Ice Co.* (1955) 45 Cal.2d 30, 36 [286 P.2d 21]; *Warner v. Santa Catalina Island Co.* (1955) 44 Cal.2d 310, 317 [282 P.2d 12]; Civ. Code, § 1714.) The questions of causality, foreseeability and reasonableness which derive from this rule are factual, and thus constitute questions for the jury. (E.g., *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]; *Warner v. Santa Catalina Island Co., supra,* 44 Cal.2d at p. 318; see 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 492, p. 2755.) ■ Similarly, the chief affirmative defenses which defendant may raise in response to plaintiffs' claims, contributory negligence (*Needham v. S. F. & S. J. R. Co.* (1869) 37 Cal. 409, 419) and assumption of risk (*Hayes v. Richfield Oil Corp.* (1952) 38 Cal.2d 375, 384-385 [240 P.2d 580]) are also questions of fact. (See *Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 500 [102 Cal.Rptr. 795, 498 P.2d 1043]; Prosser, Law of Torts (4th ed. 1971) p. 447.)

Until recently, however, in cases in which plaintiffs sought to hold bartenders[7] liable for injuries caused by their sale of liquor to intoxicated customers, the courts did not treat the question of a bartender's liability as a question of fact. Instead, under the doctrine of *Cole v. Rush* (1955) 45 Cal.2d 345 [289 P.2d 450, 54 A.L.R.2d 1137], our courts held that bartenders were not liable as a matter of law since, the decisions maintained, as a matter of law, the consumption of alcoholic beverages, and not their provision, was the proximate cause of any injury to

---

[6] Because we conclude that the trial court misgauged the plausibility of plaintiffs' willful misconduct theory, and therefore erred in granting nonsuit, we do not pass on plaintiffs' claim that defendant induced Ewing to drink the rum.

[7] Unless otherwise indicated, we hereinafter refer to both defendants and their employees as "bartenders."

intoxicated customers or to third parties who were injured by intoxicated customers. (See, e.g., *id.,* at p. 356; *Fleckner* v. *Dionne* (1949) 94 Cal.App.2d 246 [210 P.2d 530]; see generally Keenan, *Liquor Law Liability in California* (1973) 14 Santa Clara Law. 46, 54-59.)

We exploded this obsolete fiction in *Vesely* v. *Sager, supra,* 5 Cal.3d 153: "Under the . . . principles of proximate cause, it is clear that the furnishing of an alcoholic beverage to an intoxicated person may be a proximate cause of injuries. . . ." (*Id.,* at p. 164.) In *Vesely,* which came before us on the pleadings, we held that, if defendant had violated Business and Professions Code section 25602, which classifies as a misdemeanor the sale of alcoholic beverages to "any obviously intoxicated person," plaintiff, under Evidence Code section 669, could rely upon section 25602 as the source of defendant's duty of care. (5 Cal.3d at p. 165.) In *Bernhard* v. *Harrah's Club* (1976) 16 Cal.3d 313 [128 Cal.Rptr. 215, 546 P.2d 719], however, we held that *Vesely's* repudiation of *Cole* stripped bartenders of their exemption from *both* statutory and common law liability: "Although we chose to impose liability on the *Vesely* defendant on the basis of his violating the applicable statute, the clear import of our decision was that there was no bar to civil liability under modern negligence law." (16 Cal.3d at p. 325.)

Our prior decisions thus suggest that we should not treat this case differently, simply because it concerns a bartender's sale of liquor, from any other case in which plaintiffs claim that defendant breached a duty of due care. Defendant, however, noting that both *Vesely* and *Bernhard* involved suits in which third parties sought to hold bartenders liable for the acts of intoxicated purchasers, argues that these decisions do not affect the application of *Cole* v. *Rush, supra,* in cases like this one, in which representatives of the customer himself sue the bartender. Insofar as the customer is concerned, defendant asserts, it still remains true that consumption of liquor, and not the sale, is the sole cause of any injury.

This argument fails on its face. The proximate cause fiction blocked suits by purchasers and third parties alike. (Compare *Cole* v. *Rush, supra,* 45 Cal.2d 345 with *Fleckner* v. *Dionne, supra,* 94 Cal.App.2d 246.) *Vesely's* repudiation of the fiction applies equally in both contexts. We hold that *Vesely* and *Bernhard* govern regardless of whether a third party injured by an intoxicated customer or a customer himself sues a bartender: the bartender's liability in both circumstances depends upon the application of the principle that an individual is liable for foreseeable injuries caused

by his failure to exercise reasonable care.[8] As we noted at the outset, the application of this principle turns on the facts of each case.

In this case we must decide whether the trial court erred in taking this factual determination away from the jury. To do so, we must initially determine whether a jury, if it could conclude that Lamont's conduct breached defendant's duty of care to Christopher Ewing, could also conclude that such conduct amounted not merely to negligence but to willful misconduct. Next, we must consider a jury's possible assessment of Christopher Ewing's conduct: whether a jury could reasonably conclude that Ewing's conduct amounted to no more than contributory negligence, or rather, whether the jury must conclude that Ewing's conduct amounted to willful misconduct.

If a jury could reasonably find only that the bartender was negligent and that Ewing was also negligent, Ewing's contributory negligence would of course bar plaintiffs' recovery and justify the trial court's nonsuit. If, however, a jury could find that Lamont's conduct amounted to willful misconduct, while Ewing's conduct was merely negligent, plaintiffs could recover (*Williams* v. *Carr* (1968) 68 Cal.2d 579, 583 [68 Cal.Rptr. 305, 440 P.2d 505]), and the trial court's nonsuit would be erroneous. Finally, if a jury could reasonably conclude only that Lamont's conduct and Ewing's conduct constituted similarly willful misconduct, plaintiffs would again be barred. (*Cawog* v. *Rothbaum* (1958) 165 Cal.App.2d 577, 591 [331 P.2d 1063].)

We must also consider the question of assumption of risk. Specifically, we must decide whether a jury, on the basis of plaintiffs' evidence, could reasonably conclude *only* that Christopher Ewing assumed the risk of acute alcohol poisoning, the cause of his death. If assumption of risk is thus established as a matter of law, plaintiffs could not recover even if a jury could find that the bartender's conduct amounted to willful misconduct. (See *Ching Yee* v. *Dy Foon* (1956) 143 Cal.App.2d 129, 135 [299 P.2d 668].)

---

[8] Two courts have declared, even after *Vesely*, that "the drinking of alcoholic beverages and not the serving is *the* proximate cause of any injury that results to the drinker from his own intoxication. . . ." (*Rose* v. *International Brotherhood of Electrical Workers* (1976) 58 Cal.App.3d 276, 279 [129 Cal.Rptr. 736]; accord, *Cooper* v. *National Railroad Passenger Corp.* (1975) 45 Cal.App.3d 389, 393 [119 Cal.Rptr. 541, 76 A.L.R.3d 1210].) To the extent that the decisions in *Rose* and *Cooper* rest on the obsolete proximate cause fiction, we disapprove of them. We also disapprove of *Kindt* v. *Kauffman* (1976) 57 Cal.App.3d 845 [129 Cal.Rptr. 603], insofar as dicta in the majority opinion in that case (see *id.*, at pp. 854-859) suggest that bartenders owe no duty of care to their patrons.

Before we return to the facts of this case, a final observation is in order. Because we review a trial court's nonsuit order, we must inevitably apply a different standard in identifying the conclusions which a jury could draw as to the conduct of Lamont and Christopher Ewing. As we noted at the outset of our statement of facts, we must view plaintiffs' evidence in its most favorable light insofar as plaintiffs' case is concerned. Accordingly, in considering the conclusions that a jury could draw with regard to Lamont's conduct, we must view Lamont's conduct as unfavorably as the evidence will permit. On the other hand, in evaluating the conclusions which a jury could draw concerning Christopher Ewing's conduct, we must regard Ewing's conduct in the most favorable light which plaintiffs' evidence reveals.

3. *In this case, the jury could reasonably conclude that the bartender engaged in willful misconduct, while the patron engaged only in negligent conduct.*

Because our inquiry here is ultimately a search for willful misconduct, we state the appropriate standard at the outset. ■ "[W]illful misconduct implies the intentional doing of something either with knowledge, express or implied, that serious injury is a probable, as distinguished from a possible, result, or the intentional doing of an act with a wanton and reckless disregard of its consequences." (*Williams* v. *Carr, supra,* 68 Cal.2d 579 584.) ■ "If conduct is sufficiently lacking in consideration for the rights of others, reckless, heedless to an extreme, and indifferent to the consequences it may impose, then, regardless of the actual state of the mind of the actor and his actual concern for the rights of others, we call it willful misconduct. . . ." (*Pelletti* v. *Membrila* (1965) 234 Cal.App.2d 606, 611 [44 Cal.Rptr. 588]; see also *Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 869-870 [118 P.2d 465]; *Morgan* v. *Southern Pacific Trans. Co.* (1974) 37 Cal.App.3d 1006, 1011-1012 [112 Cal.Rptr. 695]; Rest.2d Torts, § 500.)

■ In order to resolve the issue of the bartender Lamont's willful misconduct, we set forth the salient aspects of his activities, viewing them in the light most unfavorable to him in which a reasonable jury could regard them.

Lamont plainly acted intentionally in serving liquor to Chris Ewing. He also acted intentionally in serving Ewing 151 proof rum. Jerry Powers asked only for "the strongest drink in the house"; it was Lamont who initially selected the rum. Moreover, because Lamont had to remove the

rum from its shelf below the bar before serving Chris, and reshelve it after each serving, the jury could reasonably conclude that Lamont did not serve Chris even the last shots of rum without knowledge of the specific drink he was serving.

Lamont knew the significance of differences in proof. He knew, further, that the rum which he served Chris was anywhere from twice to half again the potency of ordinary liquors. Moreover, Lamont knew that Chris was probably an inexperienced drinker; not only his age, which Lamont knew, but the apparent novelty he saw in drinking, suggested this fact. Lamont could conclude, therefore, that Chris was not fully aware of the radical difference in potency between the rum and ordinary liquor; indeed, Lamont's own warnings to Chris evidence Lamont's knowledge of this relative disparity in experience.

Lamont knew that Chris intended to get drunk; Chris said so. Lamont also knew that his own warning to Chris to take it easy, urged after pouring the third round, had been without effect. Knowing that Chris probably did not fully comprehend the implications of the high potency of the liquor he was drinking, and knowing as well of Chris' intent to get drunk, Lamont could have concluded, or should have concluded, that Chris might consume an amount of liquor hazardous to his health. As a bartender with 11½ years of experience, Lamont knew or should have known that, beyond a certain level, consumption of alcohol creates an immediate health hazard.

Finally, Lamont acted in violation of two rules of practice at the Cloverleaf Bowl. He repeatedly filled the shot glasses beyond the seven-eighths line, in contravention of ordinary policy. Moreover, in view of the testimony of Jean Enos, he continued to serve Chris after Chris was manifestly intoxicated, in violation of a posted rule, and even attempted to serve Chris after his brother Doug's arrival, at a point at which Chris was barely conscious.

This description of Lamont's acts suggests not merely a want of ordinary care, but willful misconduct.[9] Lamont acted intentionally,

---

[9]Because a jury could conclude that Lamont's conduct amounted to willful misconduct, this case is obviously distinguishable from those cases in which Courts of Appeal have held that patrons' contributory negligence barred their actions against bartenders. In those cases, patrons claimed *only* that bartenders acted *negligently*. (See *Rose* v. *International Brotherhood of Electrical Workers, supra,* 58 Cal.App.3d 276, 278; *Venzor* v. *Santa Barbara Elks Lodge* (1976) 56 Cal.App.3d 209, 212 [128 Cal.Rptr. 353]; *Carlisle* v. *Kanaywer* (1972) 24 Cal.App.3d 587, 590 [101 Cal.Rptr. 246]. See also *Sargent* v. *Goldberg* (1972) 25 Cal.App.3d 940, 944 [102 Cal.Rptr. 300].)

aware of the health hazard created by Chris' relative inexperience and continued drinking, without regard for the Cloverleaf Bowl's standard practices, which if followed would have stopped Chris' drinking short of its fatal conclusion. We emphasize that this interpretation is not the only rendition that a jury could reasonably attach to Lamont's conduct; it is, however, *one* reasonable interpretation.

■ Because we review a nonsuit, and therefore view plaintiffs' case in its most favorable light, we analyze Christopher Ewing's conduct in that benign aspect, in sharp contrast with our review of Lamont's acts.

Chris intended to get drunk; he did not intend to consume a fatal overdose of alcohol. Although a prudent man would no doubt have inquired into the consequences of differences in proof, Chris' failure to so inquire hardly rises to the level of recklessness. In view of his evident inexperience, Chris had no reason to know of the possibility of alcohol poisoning. ■ ■ ■ ■ ■ Since Chris' companions warned him he would get drunk, perhaps he could be said to have acted in reckless disregard of the usual consequences of intoxication as such.[10] His companions, however, did not warn him that he would die. Indeed, one associate, Jerry Powers, indicated that he himself had in the past consumed great quantities of 151 proof rum. Plainly, therefore, Chris did not recklessly court the risk of acute alcohol poisoning.

In sum, a reasonable jury could conclude that Christopher Ewing was merely negligent. If plaintiffs establish defendant's willful misconduct, contributory negligence does not bar recovery. (*Williams* v. *Carr, supra,* 68 Cal.2d 579.) Here, we have already seen that a reasonable jury could conclude that Lamont, defendant's employee, engaged in willful misconduct. Unless Christopher Ewing assumed the risk of acute alcohol poisoning, the trial court erred in granting defendant's motion for nonsuit.

[10]Even with respect to the usual consequences of intoxication, the question of the patron's willful misconduct would be a question of fact, and thus ordinarily a matter for the jury. For example, a patron may be able to show that, although he intended to become intoxicated, he took steps to insure that his intoxicated conduct would not endanger himself or others. Were a patron to make such a showing, a jury might conclude that, although the patron did not exercise due care in becoming intoxicated, the patron nonetheless did not commit willful misconduct. We disapprove of *Kindt* v. *Kauffman, supra,* 57 Cal.App.3d 845, 852, to the extent that it holds that, as a matter of law, a patron necessarily commits willful misconduct in consuming sufficient liquor to bring about a state of intoxication.

4. *In this case, the jury could reasonably conclude that the patron did not assume the risk of the bartender's willful misconduct since the specific risk to which the bartender's misconduct exposed the patron was not one which the patron appreciated.*

Defendant argues that, notwithstanding any possible willful misconduct on the part of its bartender, the trial court could nonetheless properly grant defendant's motion for nonsuit on a theory of assumption of risk. In support of this argument, defendant refers to two cases in which Courts of Appeal have held that bar patrons who knowingly become intoxicated assume the risk, as a matter of law, of various dangers to which their intoxicated state renders them vulnerable. (See *Rose* v. *International Brotherhood of Electrical Workers, supra,* 58 Cal.App.3d 276, 279-280; *Cooper* v. *National Railroad Passenger Corp.* (1975) 45 Cal.App.3d 389, 393-394 [119 Cal.Rptr. 541, 76 A.L.R.3d 1210].) As we shall see, however, these cases are not relevant here.

In *Cooper,* plaintiff sued defendants in order to recover compensation for injuries from a fall which plaintiff incurred while attempting to make use of restroom facilities on board defendants' train. Plaintiff's complaint alleged that she was in an intoxicated state when she boarded defendants' train, but that, although she was obviously intoxicated, defendants nonetheless sold her further drinks on board the train. The trial court sustained defendants' general demurrer. The Court of Appeal affirmed the trial court's order insofar as it rejected plaintiff's theory that defendants were liable because they sold her liquor at a time when she was obviously intoxicated. "[E]ven though the server is negligent and in violation of law by continuing to serve alcoholic beverages to an obviously intoxicated drinker, the drinker's cause of action is barred . . . by his voluntary assumption of the known and conspicuous risks incident to the consumption of alcoholic beverages in bars. [Citations omitted.] One of these known and conspicuous risks is the possibility that the bartender will negligently fail to recognize the drinker's obviously intoxicated condition." (45 Cal.App.3d at pp. 393-394 [fn. omitted].)

In *Rose,* survivors of an individual who was killed in an automobile accident shortly after leaving defendant's picnic, sued defendant, claiming that defendant had negligently furnished the decedent intoxicating beverages while he was obviously in a state of intoxication. The trial court sustained defendant's demurrer. Relying upon *Cooper,* the Court of Appeal affirmed, holding that "the drinker's cause of action is barred by

his voluntary assumption of a known risk. . . ." (58 Cal.App.3d at p. 279.)

We do not consider whether *Cooper* and *Rose* are, on their facts, distinguishable from the case at hand. Rather, we conclude that the court in *Cooper,* and thus the court in *Rose,* incorrectly characterized the rules which define whether or not a plaintiff assumed a risk. Accordingly, these cases cannot control here.

Specifically, in *Cooper* the court erred in focusing exclusively on the conduct which creates the risk. Certainly, "a person, if he is fully informed, may assume a risk even though the dangerous condition is caused by the negligence of others." (*Prescott* v. *Ralphs Grocery Co.* (1954) 42 Cal.2d 158, 162 [265 P.2d 904].) Perhaps an individual may also assume risks created by willful misconduct. In this context, however, the degree of defendant's culpability is simply not the ultimate issue: instead, as our cases repeatedly hold, to determine whether there is a "voluntary acceptance of the risk," we must identify the *specific "danger involved,"* and judge the individual's "knowledge and appreciation" of that danger. (*Prescott* v. *Ralphs Grocery Co., supra.*)

 "To warrant the application of the doctrine [of assumption of risk] the evidence must show that the victim appreciated the specific danger involved. He does not assume any risk he does not know or appreciate . . . . Stated another way, before the doctrine is applicable, the victim must have not only general knowledge of a danger, but must have knowledge of the particular danger, that is, knowledge of the magnitude of the risk involved." (*Vierra* v. *Fifth Avenue Rental Service* (1963) 60 Cal.2d 266, 271 [32 Cal.Rptr. 193, 383 P.2d 777]; accord., e.g., *Timmons* v. *Assembly of God Church* (1974) 40 Cal.App.3d 31, 41 [115 Cal.Rptr. 917]; *Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 522-523 [105 Cal.Rptr. 904]; *Carr* v. *Pacific Tel. Co.* (1972) 26 Cal.App.3d 537, 542 [103 Cal.Rptr. 120].) "Under ordinary circumstances the plaintiff will not be taken to assume any risk of either activities or conditions of which he is ignorant." (Prosser, Law of Torts (4th ed. 1971) 447.)

 The specific risk in this case is the risk of acute alcohol poisoning. To hold that Christopher Ewing assumed this risk we would be required to reach either of two conclusions. On the one hand, we would have to conclude (1) that plaintiffs, in presenting their case, introduced evidence which suggests that Chris Ewing knew that, by consuming 10 shots of 151 proof rum, he would subject himself to acute alcohol poisoning, and (2) that plaintiffs introduced no evidence which

would rebut this suggestion. Alternatively, we would be compelled to conclude that, as a matter of law, any patron of a bar who consumes 10 shots of 151 proof alcohol must know of the risk of acute alcohol poisoning.

As we have already seen, however, the facts of this case, as plaintiffs developed them, refute both alternatives. Plaintiffs' evidence suggests that Christopher Ewing was an inexperienced drinker. As plaintiffs' evidence shows, both the bartender Lamont and the waitress Diane Kerr recognized Chris Ewing's naivete. We cannot conclude, therefore, that plaintiffs, in presenting their own case, conclusively established defendant's claim of assumption of risk. Nor can we conclude, in light of plaintiffs' evidence to the contrary, that it must necessarily be the case that *all* consumers of great quantities of 151 proof rum know of their peril. Accordingly, we hold that the trial court's nonsuit is not justified upon the theory of assumption of the risk.

### 5. *Conclusion,*

In this case, a commercial vendor of liquor, an experienced bartender, knowing that the youthful patron standing before him had become 21 years of age that day, served the young customer in the course of one and a half hours lethal quantities of the "strongest drink in the house." The youth died of acute alcohol poisoning. Yet the trial court cast an armour of protection around this entrepreneur based upon an inflexible rule that a patron who suffers injury from his own intoxication cannot recover from a bartender, no matter how negligent or reckless the bartender's conduct may be. Even assuming the negligence of the young patron, a jury could very well find willful misconduct on the part of the bartender; such conduct would remove the bar of contributory negligence. A jury could also very well conclude that, while contributorily negligent, the youthful patron did not assume the risk of acute alcohol poisoning, the risk of his own death.

The trial court erred in granting defendant's motion. for nonsuit. The judgment is reversed.

Bird, C. J., Mosk, J., Richardson, J., Manuel, J., and Sullivan, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

**CLARK, J.,** Dissenting.—Like the majority, I too am moved by the tragedy visited upon two minor sons of a young man who, cold sober, intentionally sets out to drink himself into oblivion.[1]

Unlike the majority, I cannot conclude that a bartender who negligently—even recklessly—sets up the drinks ordered shall be liable to a patron who intentionally injures himself. While reaching a sympathetic result, the majority's paternalism is destined to create unfortunate law.[2]

Because the issues concerning us are essentially factual, cross-illumination of the record is revealing, particularly as it relates to Ewing's misconduct.

Ewing went to the bar, challenged to consume the strongest drink in the house. According to plaintiffs' witnesses, Ewing bet he could drink 10 shots of 151-proof rum.[3] Arriving at the bar in the company of friends aware of his intentions, Ewing stated: "I'm 21 and I'm not even drunk." A 151-proof drink was served Ewing with a statement from Powers, Ewing's off-duty bartender friend, that it would make him drunk. Friend Whitlock also warned that it was a strong drink, and the bartender characterized it as a powerful drink. Yet Ewing drank two in immediate succession. At this point the cocktail waitress suggested he wait a few minutes and he would surely become drunk. But he drank a third after the bartender warned, "Chris, take it easy on this stuff. Its going to catch up with you and knock you for a loop."

---

[1] This action in behalf of the minors is brought by their mother. The dissolution of her marriage to Christopher Ewing had become final shortly before his death, although she had separated from him approximately 15 months earlier. She testified he was a fond parent and enjoyed his children whenever she brought them to his parents' home so he could exercise visitation rights. However, he never contributed to the children's support after separating from his wife, the children being supported on welfare. With one possible exception he visited the children only when they were brought to him.

[2] Mr. Ewing, of course, is not being compensated. But if his heirs are entitled to recover in a wrongful death action, then he too would be entitled to recover for personal injuries suffered had prompt medical intervention resulted in his survival. In net effect then, the majority would condone an award of lifetime support for an imbiber who succeeds only in permanently damaging his nervous system. The same drinker who falls off his bar stool injuring his drinking arm must also be compensated under the majority's holding.

[3] Such a bet was claimed to have been made with Jerry Powers who denied having made it. Ewing's girl friend, Jean Enos, and sister-in-law, Deborah Ewing, both testified to the wager, the girl friend further testifying that pursuant to the wager, Ewing was required to, and did in fact, consume the drinks in an hour. Lloyd Whitlock, engaged to Ewing's sister, also so testified.

After the third, Ewing moved to his girl friend's table where she asked him to "stop drinking that fast." He replied he would be all right, immediately returning to the bar.

After four more of the same in quick succession, Ewing returned to his girl friend's table and, while he appeared to be experiencing intoxication and admitted to being a little drunk, he again ignored her, insisting he would be all right. Returning to the bar, he had three more of the same. All 10 drinks, according to his girl friend's testimony, were consumed in "[h]alf an hour to 45 minutes."

Assuming—as the majority hold—the bartender's actions constitute willful misconduct, such is not actionable if Ewing either committed willful misconduct (see *Cawog* v. *Rathbaum* (1958) 165 Cal.App.2d 577, 591 [331 P.2d 1063]), or assumed the risk of acute alcoholic poisoning (see *Ching Yee* v. *Dy Foon* (1956) 143 Cal.App.2d 129, 135 [299 P.2d 668]).

In addressing the issue of willful misconduct, the majority gratuitously and inexplicably hold that while Ewing intended to get drunk, his conduct "*hardly rises to the level of recklessness.*" (*Ante,* p. 404; italics added.) But the record *compels* the opposite. He wagered with his friend to drink 10 shots of the strongest drink in the house—all in an hour. He won that—his last wager—after serving notice he was not "even drunk" at the beginning of his drinking orgy. He was initially warned by both friend and bartender of the beverage's potency; warned after two drinks he would be drunk if he only waited; warned again by the bartender before the third drink to "take it easy on this stuff"; warned again by his girl friend to slow down after the third drink; and after the seventh drink, notwithstanding further warning, returned for three more. By what standard may the majority claim this conduct was not reckless as a matter of law?

On the one hand, the majority hold the bartender's misconduct willful, constituting " 'the intentional doing of something either with knowledge, express or implied, that serious injury is probable as distinguished from a possible, result, or the intentional doing of an act with a wanton and reckless disregard of its consequences.' " (*Ante,* p. 402.) On the other, how can it be said as a matter of law that Ewing did not intentionally set out to consume 10 drinks with knowledge that serious injury was probable? Alternatively, did he not intentionally consume the alcohol with a

wanton and reckless disregard for the consequences? The answers are obvious.

The majority take comfort along an easier path home. The bartender, they say, is guilty of willful misconduct because of his superior knowledge and from the rule, on reviewing a judgment after a motion for nonsuit has been granted, that all testimony must be construed favorably toward plaintiff and unfavorably toward defendant. But we do not judge who was *more* culpable in this drinking bout. Ours is not a process of weighing fault. Regardless of the majority's fine distinctions, plaintiffs are not entitled to relief if Ewing's misconduct was willful within the meaning of established standards.[4]

The judiciary has been justly criticized in recent years for its failure to place liability on one truly guilty of irresponsible conduct, whether negligent, reckless, willful, criminal or drunken. In this case, we not only relieve the true wrongdoer of liability but nobly reward him for succeeding in fingering someone who, while neither originating nor encouraging the course of misconduct, became the instrument in paving the path to destruction.

I am not alone in my concern for the societal effect of today's decision. During the appellate process in the instant matter the judgment of nonsuit was affirmed by the Court of Appeal, First District, Division Two. A portion of Justice Rouse's good opinion must be quoted: " 'The inestimable gift of reason and self-control cries out for preservation in every person, and the duty of its preservation devolves upon each member of the public. When the restraint of reason and the ability to care for one's self are perverted by a conscious, self-indulgent act of voluntary intoxication which temporarily casts off those powers, no societal or personal wrong, nor violation of public or social policy is accomplished or violated if the actor is alone held answerable for his

---

[4]Because Ewing's misconduct was willful we need not consider whether plaintiffs are precluded recovery for the further reason that the deceased clearly assumed the risk of acute alcoholic poisoning. The majority conclude the risk was not assumed because "the specific risk," i.e., the risk of poisoning to which Ewing was exposed, was not one he could appreciate. In reaching such conclusion, the majority *again fail to consider* relevant undisputed warnings. Everyone who advised him cautioned he would become drunk after two or three drinks. Yet he recklessly consumed four to five *times* that amount of alcohol, stating he would be "all right." Even after admitting he was drunk he quickly consumed three more, enough alcohol to make him drunk if he had then been completely sober, according to all information he had received. How can it be objectively stated, even as a matter of law, that Christopher did not *knowingly* assume the *risk* of acute alcoholic poisoning?

injury . . . . [¶] Governmental paternalism protecting people from their own conscious folly fosters individual irresponsibility and is normally to be discouraged . . . . To go yet another step and allow monetary recovery to one who knowingly becomes intoxicated and thereby injures himself is in our view morally indefensible.' "

Justice Rouse quotes in turn from an opinion of the Court of Appeal, Third District. In *Kindt* v. *Kauffman* (1976) 57 Cal.App.3d 845 [129 Cal.Rptr. 603] (petn. for hg. den.), the court affirmed a judgment for defendant tavern keeper after the trial court had sustained, without leave to amend, the demurrer to a complaint alleging defendant had served liquor to an obviously intoxicated patron, who injured himself while driving his car. The *Kindt* court, noting that alcohol is responsible for "the devastating highway carnage resulting from automobile accidents" stated: "Everything reasonably conceivable should be done to discourage such activity; conversely, nothing should be done to encourage it, particularly by the judiciary. A rule of liability here could have no other possible effect upon patrons than to encourage them to excessive liquor consumption at taverns. Forthwith upon the announcement of a rule of law which permits a drunken patron to recover damages for his own injuries from the tavern keeper, patrons who have heretofore felt concern for their own safety should they become overly intoxicated, will relax their personal efforts, for three readily apparent reasons: First, because they will assume that the bartenders will exercise greater care in their behalf; second, because they very naturally will feel that if they are hurt they will be compensated for such hurt; and third, because we, the judiciary, will in effect have encouraged their overindulgence, by pampering their delinquency." (*Id.*, at p. 858.)

This court has previously expressed the same concerns. In *Cole* v. *Rush* (1955) 45 Cal.2d 345 [289 P.2d 450, 54 A.L.R.2d 1137], a wrongful death action, we affirmed judgment for defendants after the sustaining of a demurrer to a complaint alleging defendants had negligently furnished intoxicating liquor to a patron, causing his death. The court's principal concern in that case was the propriety of announcing new rules governing conduct and liabilities normally a matter for the Legislature. In sharp contrast to the present court's proclivity to make, through judicial pronouncement, policy decisions of a legislative nature, the *Cole* court properly concluded it was not empowered to do what this court cavalierly does today. (See also *Kindt* v. *Kauffman, supra,* 57 Cal.App.3d 845, 851; also see *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858].) Ironically, the author of today's

majority opinion wrote for the majority in *Borer*: " 'Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree.' [¶] . . . '[N]ot every loss can be made compensable in money damages, and legal causation must terminate somewhere. In delineating the extent of a tortfeasor's responsibility for damages under the general rule of tort liability (Civ. Code, § 1714), the courts must locate the line between liability and nonliability at some point, *a decision which is essentially political.*' " (*Id.,* at pp. 446-447; italics added.)

In *Borer* we refused to extend liability essentially because the Legislature had not authorized it. We held in effect that political decisions should be left to politicians. Now, a few months later, we elect to ignore the historical dictates of *Borer,* again wandering into the legislative arena to create a far-rippling policy we are neither authorized nor equipped to make.