[Civ. No. 65285. Second Dist., Div. One. Apr. 27, 1983.]

WILLIAM FELBURG et al., Plaintiffs and Appellants, v.
DON WILSON BUILDERS et al., Defendants and Respondents.

**COUNSEL**

Kaplanis & Grimm, Trevor A. Grimm, Schurmer, Drane, Bullis & McCarthy and Walter H. Drane for Plaintiffs and Appellants.

Bonelli, Heib, Fuchs & O'Neal, Robert D. Anderson, Lawler, Felix & Hall and Stephen T. Swanson for Defendants and Respondents.

**OPINION**

**HANSON (Thaxton), J.**—Appeal taken by plaintiff homeowners William and Sunya Felburg from summary judgments entered for defendants Don Wilson Builders (Wilson), Maro Corporation doing business as Western Laboratories (Western) and Standard Oil Company of California (Standard Oil). Judgment reversed as to defendant Wilson; affirmed as to defendants Western and Standard Oil.

On January 19, 1978, plaintiffs Felburg filed suit for damages resulting from the gradual and continuing subsidence of their tract residence, located at 2511 West 233d Street in Torrance, California, into an oil sump (a hole for debris often found near oil drilling operations) under the property. The complaint, as subsequently amended on September 24, 1979, contained eight causes of action. Causes of action one through four alleged fraud and negligence against defendant builder Wilson; the fifth cause of action alleged negligence by Western, who had tested the soil for Wilson; causes of action six, seven and eight were against Standard Oil, alleging damages caused by nearby drilling, negligence, and negligence per se. Plaintiffs sought compensatory damages, in-

cluding emotional distress damages, and in addition, exemplary (punitive) damages against defendant builder Wilson in the first, second and third causes of action.

## Dispositive Issues

The principal issue is whether plaintiffs' causes of action were barred by the statute of limitations set forth in Code of Civil Procedure section 337.15, enacted in 1972,[1] as to defendants Wilson and Western. In addition, at issue is the liability, if any, of Standard Oil for plaintiffs' damages.

It is well established that the purpose of summary judgment procedure, as set forth in Code of Civil Procedure section 437c, is to weed out cases where there are no triable issues of fact. ■ As was stated so succinctly in *Sevilla* v. *Stearns-Roger, Inc.* (1980) 101 Cal.App.3d 608, 610 [161 Cal.Rptr. 700], "Summary judgment is the appropriate disposition of an action which on its face is barred by the statute of limitations [citation]. However, summary judgment procedure is drastic and should be used with caution and not become a substitute for trial [citation]." Despite clogged court calendars, parties are entitled to trial of their causes on the merits, unless it clearly appears that there is nothing at issue. ■ "Under well established rules governing summary judgment motions, the affidavits of the moving party are to be strictly construed and those of the opponent liberally construed. [Citation.] Nevertheless, a party opposing a motion for summary judgment which is supported by affidavits or declarations sufficient to sustain the motion, has the burden of show-

---

[1]That section, in pertinent part, provides as follows: "(a) No action may be brought to recover damages from any person, or the surety of a person, who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction or construction of an improvement to real property more than 10 years after the substantial completion of such development or improvement for any of the following:

"(1) Any latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement to, or survey of, real property.

"(2) Injury to property, real or personal, arising out of any such latent deficiency.

"(b) As used in this section, 'latent deficiency' means a deficiency which is not apparent by reasonable inspection.

"(c) As used in this section, 'action' includes an action for indemnity brought against a person arising out of that person's performance or furnishing of services or materials referred to in this section, except that a cross-complaint for indemnity may be filed pursuant to subdivision (b) of Section 428.10 in an action which has been brought within the time period set forth in subdivision (a) of this section.

"(d) Nothing in this section shall be construed as extending the period prescribed by the laws of this state for bringing any action.

"(e) The limitation prescribed by this section shall not be asserted by way of defense by any person in actual possession or the control, as owner, tenant or otherwise, of such an improvement, at the time any deficiency in such improvement constitutes the proximate cause for which it is proposed to bring an action.

"(f) This section shall not apply to actions based on willful misconduct or fraudulent concealment.

"' . . . . . . . . . . . . . . . . . . . .' "

ing that triable issues of fact exist." (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310]; *DeSuza* v. *Andersack* (1976) 63 Cal.App.3d 694, 698 [133 Cal.Rptr. 920].) With these principles in mind, we summarize the facts known to us in the instant case.

Plaintiffs' house stands on lot 3 of tract 28414 in the City of Torrance. Tract 28414 constitutes a small part of what originally was a large tract west of Crenshaw Boulevard, tract 2200. In 1924, Standard Oil obtained oil and gas rights beneath tract 2200 by executing two leases with surface owners John E. and Marian Marble, leases which were recorded the same year. Thirty-four oil wells were drilled on tract 2200 during the 1920's and 1930's; many are still operative today. The operative well situated on the lot adjacent to the Felburg's lot is designated No. 1-14, and was completed in 1938; the sump which is located under the Felburg house was probably created at about that time.

In about 1961, Standard Oil and builder Wilson commenced discussions concerning Wilson's proposed residential development of an area of tract 2200 he had acquired from the Marble family, to be known as the Marble Estates and financed by Home Savings & Loan Association. On November 21, 1963, Standard, while retaining the mineral rights, quitclaimed and surrendered certain acreage in the tract in favor of Wilson, by deed. It was understood by the parties that there were sumps in the land to be developed by Wilson, and that Standard did not have the requisite information whereby the location of the sumps could be completely pinpointed.[2]

The deeds executed expressly placed the obligation for making any changes or repairs to the surface of the property on the housing developers to whom the surface rights were quitclaimed, and these deeds were recorded. Included in that area so quitclaimed was the area that became lot 3 of tract 28414, the Felburg's lot.

Wilson commenced development of the tract and defendant Western was hired to investigate soil conditions. On December 5, 1963, Western certified to the City of Torrance that the grading and excavation relative to the development had been performed according to applicable codes. However, during the course of its work, Western had discovered several old sumps, including one identified as "Boring 27," in the area of the lot eventually purchased by the Felburgs. Western reported to Wilson's construction firm, Southwood, concerning the sump in a soil report dated May 16, 1963.

---

[2]A declaration filed on behalf of Standard Oil contains the following: "It was [at the time of transfer] made very clear to the developer and [its] . . . representatives that the oil field was an old one and that there was no complete record of all the buried pipelines and equipment, sumps and cellars that might at one time or another have been left in place."

On October 19, 1965, defendant Wilson obtained a building permit, to build a "model" home on plaintiffs' lot 3. On March 1, 1966, the structure was approved by the City of Torrance for use as a "model only." On March 2, 1966, defendant Wilson recorded a "Notice of Completion." Subsequent to 1965, and to August 1, 1969, the "model" was used by defendant Wilson as a sales office. On August 1, 1969, plaintiffs purchased the model from defendant Wilson. Certain additional improvements, including the installation of a water heater, were made as the result of the sale; certain site improvements were made after the sale as well, including paving the street in front of the house. On September 5, 1969, defendant Wilson obtained final approval from the City of Torrance for ordinary residential use of plaintiffs' home.

In July 1971, plaintiffs experienced some cracks in their home which they attributed to the operation of oil well No. 1-14, adjacent to their home, and the vibrations therefrom. However, in December of 1976, plaintiffs discovered a depression in the soil under the middle section of their home, which caused a separation between the supporting piers and the foundation. The City of Torrance investigated the situation in January 1977, and the plaintiffs then had soils tests performed on the property by S. E. Medall & Associates, who reported on October 11, 1977, that they had discovered an old oil sump underlying plaintiffs' residence approximately 50 feet by 30 feet by 10 feet deep, very likely "Boring 27," the existence of which had been noted by Western some 14 years earlier.

The subsidence apparently accelerated after 1976, causing cracked foundations, movement of walls, cracking of plaster and tile, windows and cabinets out of plumb to the point of inoperative status, broken windows, inoperable plumbing.[3]

In opposition to summary judgment, plaintiffs submitted the declaration of Lawrence R. Kabakoff, a licensed general building contractor, who inspected the Felburg foundation on August 8, 1981. After describing his tests, Kabakoff was of the opinion that it would have been impossible to pour the foundation of the home without seeing the evidence, in plain view, that the lot was over an oil sump. The evidence was so clear, according to Kabakoff, that "it makes me of the opinion that there was a conscious effort to ignore this condition."

---

[3]The plight in which plaintiffs find themselves can be appreciated by reading the declaration of plaintiff Sunya Felburg, who states, in part:

"We bought our home in 1969. Starting about October, 1976, our home apparently began to sink into the ground. The sinking, the cracking, the splitting of the house since that time has been continuous and progressive. I am having a nervous breakdown just from living there. To put it mildly, I feel like I am watching my house die before my eyes. We do not have the money to cure this insidious disease. We are now having plumbing problems. Some days different *toilets* overflow. We had to pull up carpeting ruined by the water. Due to the changing level of the house, I never know which toilet will flush and which will overflow.

"I had to move my daughter out of her downstairs bedroom. The windows have broken due to the increased pressure on them. It is like walking downhill when you are in the bedroom . . . ."

DISCUSSION

I

The trial court granted summary judgment to defendant developer Wilson on the ground that the Felburg home had been substantially completed in 1966, when Wilson filed the "Notice of Completion" with the City of Torrance, and that since the Felburgs did not file their suit until 1978, the 10-year statute of limitations set forth in Code of Civil Procedure section 337.15 barred the suit.

As was explained in *Regents of University of California* v. *Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624, 633, footnote 2 [147 Cal.Rptr. 486, 581 P.2d 197], section 337.15 constitutes a rational legislative classification affording protection to developers, builders, contractors and others engaged in improving real property, by establishing a finite limit to their future liability for latent defects in the work done, i.e., a 10-year period which accrues from *completion* of the project rather than from discovery, by the aggrieved party, of a cause of action against the developer, etc.

It is stated in *Regents* that "a contractor is in the business of constructing improvements and must devote his capital to that end; the need to provide reserves against an uncertain liability extending indefinitely into the future could seriously impinge upon the conduct of his enterprise . . . ." The section has withstood constitutional challenge, on equal protection grounds. (See *Regents, supra,* and *Barnhouse* v. *City of Pinole* (1982) 133 Cal.App.3d 171 [183 Cal.Rptr. 881].) It has been construed as affording no protection to ordinary vendors of property (*Eden* v. *Van Tine* (1978) 83 Cal.App.3d 879, 885-886 [148 Cal.Rptr. 215, 12 A.L.R.4th 856], subd. (e) of § 337.15) and has no application to suits brought for personal injuries sustained as the result of latent defects in property construction or design. (*Martinez* v. *Traubner* (1982) 32 Cal.3d 755 [187 Cal.Rptr. 251, 653 P.2d 1046].)

Plaintiffs argue that the trial court was incorrect in determining that the home was completed in 1966, thus triggering the running of the statute; in view of our disposition of this matter, we need not analyze the propriety of the lower court's ruling in this regard.

Insofar as we have been able to discover, there is no published decision assessing the impact of subdivision (f) of section 337.15, which excepts from its application "actions based on willful misconduct or fraudulent concealment"—these are not barred by the 10-year statute. In the instant case, plaintiffs pleaded these elements, wilful misconduct and fraudulent concealment, in the first, second and particularly the third causes of action against developer Wilson. The term "willful misconduct" as used in the statute encompasses not only intentional wrongdoing, but negligence of such a character as to constitute reckless disregard for the rights of others. (See *Ewing* v. *Cloverleaf Bowl*

(1978) 20 Cal.3d 389, 402 [143 Cal.Rptr. 13, 572 P.2d 1155].)  ▮  Nothing in the moving papers of Wilson seeking summary judgment effectively dispelled the existence of these elements so as to preclude them from raising triable issues of fact. In addition, the entire record, including materials presented by Standard Oil, developer Wilson and the declaration of Kabakoff offered by plaintiff, suggests sufficient grounds for trial on the merits of the issue of developer Wilson's knowledge of the presence of "Boring 27" under plaintiffs' property—either actual or constructive—and possible concealment of the sump with fraudulent intent. We emphasize that neither the trial court nor this court resolve these factual issues in summary judgment proceedings; we merely identify them. It may be that developer Wilson can persuade a jury that a subcontractor was the actual culprit in this egregious situation, but the issue of whether the subcontractor's knowledge could be reasonably imputed to Wilson is also a question of fact. Thus we reverse the judgment in favor of developer Wilson.

We note that plaintiffs have urged, on appeal, that they have stated an independent action for infliction of emotional distress not barred by the statute. We view plaintiffs' pleading as setting forth emotional distress as an element of compensatory damages; in view of our holding that plaintiffs' first, second and third causes of action against developer Wilson are not barred, and compensatory damages including emotional distress damages may be sought, we need not decide the viability of actions for emotional distress as they relate to latent defects in real property construction in other contexts, and we do not undertake that task here.

## II

▮  Plaintiffs also attempted to state causes of action against Standard Oil, the entity which conveyed certain surface rights and acreage in the oil field, replete with sumps, cellars and old pipelines to a developer, retaining mineral rights and operative wells on the proposed residential site. It is clear that Standard Oil knew—or could reasonably foresee—that the site, with all of its hidden dangers, would be used by the innocent purchasers of homes in Marble Estates. At issue is the liability, if any, of Standard Oil as a vendor, under these circumstances.

▮  As to plaintiffs' sixth cause of action, which sought damages because of nearby drilling, the summary judgment granted Standard Oil was clearly correct. Code of Civil Procedure section 349¾ provides a statute of limitations of 180 days for a cause of action based on damages occasioned by "a well drilled for oil or gas or both from a surface location on land other than real property in which the aggrieved party has some right, title or interest . . . ." Well No. 1-14 is not located on lot 3, although nearby, and it appears from the record that plaintiffs' cause of action accrued sometime in 1971.

It is with respect to the seventh and eighth causes of action, founded on negligence, that the real issue of liability is raised. Standard Oil, not protected by section 337.15, contended below as it does here, that it owed no legal duty to the plaintiffs.

■ It is hornbook law that "[a]ctionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury. [Citation.] The duty of care [is] always related to 'some circumstance of time, place and person' [citation]." (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770].)

■ The determination of duty is primarily a question of law. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) It is decided on a case by case basis; "[i]t is the court's expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (*Weirum, supra,* at p. 46.)

While Standard Oil was the vendor—or transferor of the land containing the oil sump, there is some question as to the extent to which the sump was filled, and at what point in time; however, the question as to Standard Oil's liability to land users down the chain of land ownership and use must be resolved, we believe, by more general principles.

As Dean Prosser points out in his authoritative text, "The vendor of real property who parts with title, possession and control of it ceases to be either an owner or an occupier [of land]. Ordinarily, therefore, he is permitted to step out of the picture and shift all responsibility for the condition of the land to the purchaser. As to sales of land the ancient doctrine of *caveat emptor* lingered on, and is still very largely in force . . . the vendor is, in general, not liable for any harm resulting from any defects existing at the time of transfer." (Prosser, Law of Torts (4th ed. 1971) pp. 412-413.) It is further noted by the author that there may be some justification for this view when the subject property has been transferred long before the cause of action is pursued, but that case law authority is very sparse in this area.

Prosser opines that the law concerning a vendor's liability in tort for negligence may be slowly evolving, due to the impact of the doctrine of strict liability in tort which affects products introduced into the stream of commerce. One exception which is recognized by the Restatement on Torts is that a vendor may be held liable if he fails to discharge "a duty to disclose to the vendee any concealed conditions known to him which involve an unreasonable danger to the health or safety of those upon the premises, and which he may anticipate that the vendee will not discover . . . . The recognition of this duty of

disclosure has thus far ended the progress of any negligence liability of the vendor." (Prosser, *supra,* p. 413.)

It appears without dispute from the record that Standard Oil not only disclosed to developer Wilson the potential existence of oil sumps and other latent dangers in the oil field, but went to considerable lengths to delegate totally the responsibility to future users of the property, by disclosure and by disclaiming liability, a disclaimer recorded by quitclaim deeds. It would appear that the first exception to the general rule of nonliability has no application. The second exception has been based upon the premise that the vendor or transferor should be held liable when the land transferred is so inherently dangerous due to some condition that social policy compels that conclusion.

In our view, present law does not designate the vendor or transferor of real property as one to which the doctrine of strict liability in tort applies. We deem that Standard Oil acted reasonably and responsibly, and discharged its duty to act with care toward all other persons (Civ. Code, § 1714) when it disclosed what information it had concerning latent dangers in the oil field to developer Wilson and cautioned that there might be areas of danger for which no records were available, considering the length of time—since 1924—the oil field had been in operation.

In an attempt to invoke the doctrine of negligence per se, the establishment of a standard of care by demonstration of violation of a statute, plaintiffs have contended that sections 97.3.1 and 97.3.2(b) of the Torrance Municipal Code required oil companies to "clean up" an oil field, and that Standard Oil violated a duty created by the ordinance. The sections in question, however, appear to specifically concern bond requirements in connection with oil fields and have no materiality herein.

We note, finally, that plaintiffs faced an additional problem insofar as Standard Oil's liability was concerned, relating to proximate cause, specifically that developer Wilson's conduct with respect to the land in question could be viewed as the intervening and proximate cause of plaintiffs' injuries. In summary, Standard Oil has no legal duty to plaintiffs, and the trial court correctly awarded it summary judgment.

### III

Defendant Western, the soil testing company for developer Wilson, was granted summary judgment also; plaintiffs have appealed from that judgment, which was granted some months earlier than those granted to Standard Oil and Don Wilson Builders. Reference was made in the notice of appeal to a stipulation whereby it was agreed that a later appeal by plaintiffs including Western

would be timely. The stipulation is not before us, nor has Western presented a brief on this appeal.

We have concluded, however, that Western, which completed its soil testing activities for developer Wilson on lot 3 in 1963, performed testing within the meaning of subdivision (a) of section 337.15; that far more than 10 years had passed from the time of completion to the filing of plaintiffs' complaint, and thus plaintiffs' action was time-barred. Subdivision (f) does not apply to Western because plaintiffs did not plead fraud or concealment as to them, and Western's moving papers in support of summary judgment reveal that Western did disclose to developer Wilson facts concerning Boring 27 and lot 3 which discharged Western's responsibility for subsequent events. We affirm the trial court's award of summary judgment to Western.

## DISPOSITION

The judgment awarded Don Wilson Builders with respect to the first, second and third causes of action, is reversed. The judgments awarded Standard Oil Company of California and Western Laboratories are affirmed. Plaintiffs/appellants Felburgs are awarded costs from defendant/respondent Don Wilson Builders only. Defendants/respondents Standard Oil Company of California and Western Laboratories are awarded costs from plaintiffs/appellants Felburgs.

Lillie, Acting P. J., and Dalsimer, J., concurred.

A petition for a rehearing was denied May 19, 1983, and the opinion was modified to read as printed above. The petitions of appellants and respondents Don Wilson Builders, Southwood Construction Company and Mecca Homes Corporation for a hearing by the Supreme Court were denied July 20, 1983. Bird, C. J., was of the opinion that the petitions should be granted.