KEMOCK, ADMR., APPELLANT, *v.* THE MARK II, APPELLEE.

(No. 945,072—Decided July 27, 1978.)

*Mr. Don C. Iler,* appellant.
*Mr. Charles M. Kampinski,* for appellee.

PATTON, J.   This appeal is before the court from a ruling of the court below directing a verdict in favor of the defendant-appellee, The Mark II, in a wrongful death action.

The complaint alleged that the plaintiff-appellant is the duly appointed administrator of the estate of the decedent, Timothy C. Woernley, who died on May 8, 1974. The appellee corporation is alleged to have been at all times relevant hereto a restaurant wherein intoxicating liquors are sold to the public. The gravamen of appellant's complaint is as follows:

"3.  On the 8th day of May, 1974, the decedent, Timothy Woernley, entered said defendant's restaurant and defendant's agents, servants and employees unlawfully sold and gave intoxicating liquors in large amounts to Timothy Woernley which he consumed and as a result, became highly intoxicated and his judgment became impaired therefrom.

"4. Defendant's agents, servants and employees sold said Timothy Woernley intoxicating liquor and continued to

sell intoxicating liquors to him with full knowledge and notice that he was intoxicated, and/or becoming intoxicated, and continued to sell intoxicating liquors to him after defendant knew, or in the exercise of ordinary care, should have known, he was intoxicated and a danger to himself and/or others. * * *

"7. As a result of the aforesaid negligent acts by the defendant, Timothy Woernley after consumming [sic] said intoxicating liquor which resulted in his loss of judgment and regard for his own safety and health, drove his automobile at a high rate of speed and without due care for his safety and thereby collided with a tree thereby causing him bodily injuries resulting in his death."

The action was brought on behalf of the decedent's five children, all minors. At the time of decedent's death, he was divorced from his ex-wife, the mother of his five children.

Appellee's amended answer generally denies the allegations set forth in the complaint and affirmatively pleads, *inter alia,* contributory negligence and assumption of the risk on the part of appellant's decedent. Additionally, appellee set forth the defense that the decedent's death occurred as a result of an intervening cause not within appellee's control. Appellee's motion to dismiss the action was overruled by the trial court.

The matter proceeded to trial, and at the close of appellant's evidence, the trial court granted appellee's motion for a directed verdict, pursuant to Civ. R. 50(A). In brief, the court found that the adult decedent acted on his own free will in becoming voluntarily intoxicated. The decedent's conduct, in short, amounted to contributory negligence as a matter of law. It is from the trial court's granting of defendant's motion for a directed verdict which plaintiff appeals and assigns as error the following:

"1. A business establishment that sells intoxicating liquor shall use ordinary care in the sale of such intoxicating liquor to patrons of the establishment who are on the premises, and where a business establishment sells alcoholic beverages to a patron and as a direct result of such sale, the patron becomes intoxicated and injures himself, an action will lie against the business establishment owner for the death or injury of such patron caused by the sale of intoxicating bever-

ages, and it is error to direct a verdict for the defendant-business establishment owner in such case.

"2. Where a business establishment that sells intoxicating liquors on its premises has a policy of not selling intoxicating liquors to its patrons who are intoxicated or who are becoming intoxicated, it is error to direct a verdict for said business establishment where the evidence discloses intoxicating liquors were sold by said business establishment to an intoxicated patron, contrary to said policy.

"3. The issue of the proximate cause between the sale of intoxicating liquor and resultant injury and death is properly left to the jury where allegations supported by evidence are such that to a seller's knowledge, the purchaser's will to refrain is so impaired that it is not possible for him to refrain from drinking the liquor when it is placed before him.

"4. The owner of a business establishment that sells intoxicating liquor to its patrons must use ordinary care to protect its patrons from the danger that is reasonable under the circumstances and such exercise of ordinary care is a question for the jury to decide.

"5. Where the defendant, prior to trial and upon deposition of the plaintiff's expert, has fully examined plaintiff's medical expert prior to trial and discovered such expert's opinions and the reasons supporting the expert's opinion, it is error to exclude such expert's testimony at trial for failure by plaintiff to submit a written report of such expert's opinion pursuant to Rule 21(A).

"6. The trial court erred in not applying the law of Comparative Negligence where the Plaintiff's Decedent was contributorily negligent."

For the reasons articulated herein, we affirm the decision of the trial court.

The facts are these. Appellant's decedent, Timothy C. Woernley, arrived at The Mark II at approximately 9:30 p.m. on May 7, 1974. Timothy Woernley went to The Mark II to see his former brother-in-law, Richard Samples, entertain. That evening, the decedent's ex-wife and Samples' sister-in-law, Deborah, and her girl friend, Chris Houser, were also present. When Timothy Woernley entered The Mark II that evening, he made his way to Deborah's table, sat down and ordered a round of drinks. The order was taken by a waitress,

who then crossed the room to the bar located directly across from the stage where Richard Samples performed. The table was located approximately fifteen feet from the stage.

At his first break, Samples joined the table, and Woernley ordered drinks for each of them. Samples observed that Timothy Woernley had just showered and appeared fresh. According to the testimony, Timothy Woernley had not been drinking prior to his entering The Mark II. Samples' sister-in-law, Deborah, and her friend left just before 10 p.m. Woernley remained and continued drinking. From approximately 11:15 p.m. to 12 midnight, Samples observed the decedent move from table to table, always with a drink in his hand, and "asking strangers' wives to dance***laughing and***being boisterous." Throughout the course of the evening, according to Samples, several times the manager of The Mark II entered the lounge area where Woernley drank. Around 11:30 p.m., Samples asked Woernley to calm down but "he just laughed and walked away." Richard Samples expressed the opinion that by 11:30 p.m. that evening, Timothy Woernley was "becoming intoxicated." Samples took an early break at approximately 11:50 p.m. and had a discussion with Woernley in the lobby area. As he pulled Woernley out of the lounge into the lobby, Samples again asked him to calm down, but Woernley struck him. Samples pushed Woernley into a chair, told him to sit there and went to get him a cup of coffee and cigarettes. Upon his return, Woernley had a fresh drink in his hand.

At that point, Samples picked up the keys to Woernley's car and told him he was "in no condition for driving a car." He told Woernley that he would call someone to come and drive him home. Woernley indicated to Samples that he should phone his sister, Susan. Samples phoned the sister. Shortly, Susan's husband and Woernley's cousin arrived at The Mark II. Upon seeing them, Woernley became enraged and rushed towards them. Samples jumped in between and attempted to reason with Woernley but to no avail. Samples wrestled Woernley through the doors and out to the parking lot. Timothy Woernley was "just out of his head at the time, screaming and yelling and carrying on." Indicating that he had to go back in and perform, Samples gave the keys to Woernley's car to one of the two relatives and told them

under no circumstances should they give the keys to Timothy, since he was in no condition to drive a car. Woernley then attacked Richard Samples and Samples struck him twice, knocking him to the ground each time. Samples returned to The Mark II. The time was approximately midnight.

Woernley continued to raise "so much cain" that Samples testified he was forced to obtain the keys from the relatives and return them to the decedent. He indicated he told Woernley: "I can't babysit for you anymore Tim. Go out and get yourself arrested. I can't do anything more. I've got a job to keep." Timothy Woernley then drove his car out of the parking lot onto Pearl Road "squeal[ing] his tires all around the corner." Richard Samples would not see Timothy Woernley alive again. The time was approximately 12:30 a.m., May 8, 1974.

Richard Samples further testified that during the time the decedent was in the lounge, he did not fight with anyone. Furthermore, he responded affirmatively to appellee's counsel's question that Timothy Woernley was, while in the lounge, "somewhat happy, albeit loud." Timothy Woernley ordered and drank what was called a "Windsor Press" and, according to Samples, had approximately a dozen drinks.

Officer Kenneth Novak, a Parma policeman, was assigned to traffic patrol that morning of May 8th. While driving westbound on Snow Road, the officer's radar screen indicated that a vehicle traveling at 61 miles per hour was approaching him from the west. Since the posted speed limit on that road was 35 miles per hour, after the car passed, Officer Novak made an immediate U-turn and pursued the speeding vehicle. The white Mustang stopped at a red light at West 54th Street and Snow Road but then made an illegal right-hand turn through the red light. As the officer pursued and turned on his flashing emergency lights, the vehicle increased its speed "as to pull away from me." After pursuing the Mustang through a couple of turns, the officer testified that he observed the car veer towards the right side of the road, and the taillights went up in the air, then went out. Upon reaching the scene, it was observed that the Mustang had struck a tree. The driver, Timothy Woernley, was unconscious. An ambulance was called; the injured decedent was removed to the hospital but died shortly thereafter. The

tree struck by the decedent was only a few feet from the driveway of his parents' home.

Upon cross-examination, the following colloquy occurred between the officer and counsel for appellee:

"Q Now, through this entire time from which you were pursuing this white Mustang, was he proceeding in a straight line?

"A It wasn't—or I should say, maybe a foot or so either way. But it was fairly straight.

"Q He wasn't weaving?

"A He wasn't weaving.

"Q In other words, you had no indication, while you were pursuing him, that he had anything to drink at the time you were pursuing him.

"Mr. Iler: Objection.

"Mr. Kampinski: This is cross examination.

"The Court: Go ahead. You may answer.

"The Witness: Would you repeat it.

"By Mr. Kampinski:

"Q At the time you were pursuing this vehicle, was there anything that would indicate to you, in any way, that this individual had anything to drink, by the operation of his motor vehicle?

"A No, sir.

"Q And he had control of the car. He was proceeding in a straight line. He made the various turns that you have already indicated.

"A That's correct.

"Q The right turn on Snow Road, the left turn on Albertly.

"A Correct."

Officer Novak testified that an automobile traveling at a speed of ten miles per hour could have safely negotiated the turn from the road into the driveway adjacent to the tree struck by the decedent. He further estimated decedent's speed at that point to have been approximately fifty miles per hour.

Dr. Samuel Gerber, Cuyahoga County's Coroner since 1937, testified that Timothy Woernley was pronounced dead at 1:24 a.m., on May 8, 1974. The cause of death was the result of fractures of the sternum and five ribs resulting in

lacerations of the heart, lungs, and spleen, in turn resulting in severe hemorrhaging. The percent of alcohol in the blood was 0.27.

Andrew Personi, district manager for Mark Restaurants, is responsible for nine restaurants, including this Mark II Restaurant on Pearl Road. The unwritten policy of Mark Restaurants, according to Mr. Personi, is that an individual should be "cut-off" if it is determined that he has had too much to drink. His instructions to the bartender and waitress were "to cut off a customer***if they felt the person was intoxicated."

Deborah Lee Woernley testified that she and her ex-husband were officially divorced on July 31, 1973. Her testimony, pertinent to this appeal, corroborated the testimony of her brother-in-law, Richard Samples, from the time she and her girl friend entered The Mark II until the time they left approximately forty minutes later.

The assignments of error are discussed out of their assigned sequence.

*Sixth Assignment of Error.*

An intermediate appellate court is the improper forum in which to request a judicially initiated shift from the doctrine of contributory negligence to comparative negligence. At least two justices of the Ohio Supreme Court have recently suggested:

"***[There is a] need for a reappraisal of the contributory negligence rule, by this court or by the General Assembly, as to whether Ohio should follow the example of various other states and adopt some form of comparative negligence. *See, e.g., Nga Li. v. Yellow Cab Co. of California* (1975), 13 Cal. 3d 804, 532 P. 2d 1226***." *Lazar* v. *Cleveland Elec. Illuminating Co.* (1975), 43 Ohio St. 2d 131, 147, Stern, J., dissenting.

We express no opinion on the question of whether a shift from contributory to comparative negligence is more properly accomplished by the legislative or judicial branch, *Bridges* v. *Union Pacific Railroad Company* (1971), 26 Utah 2d 281, 488 P. 2d 738; *Maki* v. *Frelk* (1968), 40 Ill. 2d 193, 239 N.E. 2d 445; nor do we pass judgment on the merits of one doctrine as opposed to the other. *Li* v. *Yellow Cab Co.* (1975), 13 Cal. 3d 804, 532 P. 2d 1226; *Syroid* v. *Albuquerque Gravel*

*Products Co.* (1974), 86 N.M. 235, 522 P. 2d 570. The appellant's sixth assignment of error is more appropriately advanced in another forum.[1]

*Fifth Assignment of Error.*

Appellant alleges it was error for the trial court to refuse to permit counsel to fully examine Cuyahoga County Coroner Samuel Gerber as an expert witness. The appellant desired that Dr. Gerber testify on the effects of alcohol and intoxication on the human body and this decedent in particular. Appellee's counsel objected on the ground that counsel had failed to notify him that he intended to call an expert witness and to furnish him with a copy of the expert's report as required by Rule 21(I)(A) of the Rules of the Cuyahoga County Court of Common Pleas.[2]

In responding to interrogatories, the appellant submitted the following answers:

"22. State the names and addresses of any and all proposed expert witnesses you propose using herein and the technical field in which you claim they are an expert.

"Answer: None retained yet, will forward information when experts are obtained.

"23. As respects any expert witnesses you propose calling in this matter, state the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

"Answer: See the answer to Interrogatory No. 22."

Notwithstanding, appellant neglected to supply the appellee with such information. In the unreported case of *Kovacich* v. *Sundorph Aeronautical Corp.*, Eighth Appellate District No. 32213, decided September 27, 1973, this court stated:

---

[1] The language utilized by appellant in framing this assignment makes it clear that the alleged contributory negligence of appellant's decedent is not seriously contested. Appellant's counsel requested of the trial court as well that it adopt a comparative negligence doctrine and to so instruct the jury. The trial court properly refused.

[2] Local Rule 21(I)(A), as relevant to this appeal, mandates the following:

"Since Ohio Civil Rule 16 authorizes the court to require counsel to exchange the reports of medical and expert witnesses expected to be called by each party, the Pretrial Statements shall indicate full compliance with this aspect of the rule. Expert witnesses whose reports have not been furnished prior to pretrial will not be permitted to testify at the trial."

"[I]t is the function of much of the Civil Rules and the rules of the common pleas court to encourage and permit full disclosure, to allow and encourage settlement and to afford the parties the opportunity to fully develop and present their respective cases without allowing either side the benefit of surprise or unconscionable advantage. Rule 21 is expressly designed to assure that all parties are ready to proceed when a case is called."

The appellant failed to adhere to the governing rule. The trial court did not err in refusing to permit the appellant, as proponent, to call Dr. Gerber as an expert witness.

*First, Second, Third and Fourth Assignments of Error.*

The appellant's first four assignments are consolidated for purposes of discussion and resolution. Initially, we observe that appellant's complaint alleges mere negligence on the part of appellee. The complaint does not allege that appellee's conduct was such as to constitute willful or wanton misconduct.

If we assume, as the parties before this court have, that Ohio law supports a cause of action against a liquor vendor brought by an adult patron who becomes voluntarily intoxicated as a result of taking intoxicating beverages, and thereafter drives away in an automobile, becomes involved in an accident and is either killed or injured, then we must necessarily proceed to the merits. In *Mason* v. *Roberts* (1973), 33 Ohio St. 2d 29, the Ohio Supreme Court held, *inter alia,* that Ohio's dram shop act, R. C. 4399.01, does not provide the exclusive remedy against a liquor permit holder to recover damages for the death of a bar patron.[3] The court held the proprietor to a "duty to members of the public while they are in his place of business to exercise reasonable care to protect them from physical injury as a result of violent acts of third persons." The opinion is so narrowed, however, it is unclear exactly who is covered by this extension of common law vendor liability in Ohio. For instance, the second paragraph of the court's syllabus specifically limits the proprietor's duty to third persons who are injured on the

---

[3] The wrongful death action in *Mason* was not brought under R. C. 4399.01, the dram shop act, since the name of the patron committing the act did not appear on any "blacklist," provided for by R. C. 4301.22(C).

business premises.[4] Whether this court can presently assume that liability may now extend to the proprietor as a result of injuries or death suffered by the intoxicated patron, rather than a third party, while such patron is off the business premises is not at all clear. The precise question seems not to have been litigated in this state. *Cf., Mason* v. *Roberts, supra; Taggart* v. *Bitzenhofer* (1973), 33 Ohio St. 2d 35; *Robinson* v. *Stilgenbauer* (1968), 14 Ohio St. 2d 165.[5]

California is a jurisdiction which appears to have run the full analytical cycle from no vendor liability, as a matter of law, to patrons or third parties since "the consumption of alcoholic beverages, and not their provision, was the prox-

---

[4] A student note criticizes the court's limited holding as unfortunate, since it mis-states the facts in the case.

"[T]he law stated in the syllabus of the *Mason* opinion does not address the facts of the case; whereas the syllabus declares that there shall be a cause of action for on-premises injuries, the facts in *Mason* as pleaded clearly show that the injuries were inflicted off the premises. Furthermore, the opinion of the court shares with the syllabus the erroneous assumption that the injury was incurred on the premises. The court then found liability upon the principle that a proprietor has a duty to protect business invitees from injuries on the premises. The court's holding can only be characterized as ambiguous as to whether common law vendor liability has been established in Ohio."

Note, *Liquor Vendor Liability for Injuries Caused by Intoxicated Patrons — A Question of Policy*, 35 Ohio St. L. J. 630, 633 (1974). The appellate court decision is reported at *Mason* v. *Roberts* (1971), 35 Ohio App. 2d 29.

[5] A related issue appeared at one point to be involved in the *Robinson* case. The court stated at page 167 of its brief opinion:

"***[W]e do not reach the question of law that we believed was involved in this case at the time we allowed the motion to certify, *i.e.*, whether there may be in this state a cause of action against a liquor vendor for damages proximately resulting from his negligent sale of intoxicating beverages to a known habitual drunkard.***Therefore, we express no opinion on that question of law." (Citations omitted.)

The issue here is different for at least two important reasons. First, the action in *Robinson* was brought by the executrix of the *third party decedent* against the liquor vendor for contributing to the intoxication of the alleged habitual drunkard rather than by the estate of the *intoxicated patron*, now deceased. Second, there is absolutely nothing in this record to sustain the position that Timothy Woernley was a "known habitual drunkard". In fact, appellant's answer to the following interrogatory sustains the clear conclusion that he was not a habitual drunkard:

"39. Describe the extent to which decedent drank alcoholic beverages, if any, during the last 20 years of his life; specifying the particular kind of alcoholic beverage and the quantity consumed per week.

"Answer: The last five years, the decedent did drink alcohol occasionally in highballs and did not drink beer or wine."

imate cause of any injury to intoxicated customers or to third parties who were injured by intoxicated customers" (*Cole* v. *Rush* [1955], 45 Cal. 2d 345, 356, 289 P. 2d 450), to the recognition that "the furnishing of an alcoholic beverage to an intoxicated person may be a proximate cause of injuries" (*Vesely* v. *Sager* [1971], 5 Cal. 3d 153, 164, 486 P. 2d 151, 159), to the application of *Vesely* "regardless of whether a third party injured by an intoxicated customer or a customer himself sues a bartender" (*Ewing* v. *Cloverleaf Bowl* [1978], 20 Cal. 3d 389, 400, 572 P. 2d 1155, 1160).

In *Ewing,* the California Supreme Court, sitting *in banc,* held that an intoxicated patron, or his heirs in a wrongful death action, may sue a bartender for injury or death resulting from becoming intoxicated at the hands of the serving bartender. The legal standard to be applied is "that an individual is liable for foreseeable injuries caused by his failure to exercise reasonable care."[6] *Id.* The *Ewing* majority made it clear that it rejected certain dicta in the opinion in *Kindt* v. *Kauffman* (1976), 57 Cal. App. 3d 845, 129 Cal. Rptr. 603, to the effect that "bartenders owe no duty of care to their patrons." *Id.* at 401, note 8, 572 P. 2d 1160. Moreover, the court characterized "as obsolete proximate cause fiction" the following declarations of two California appellate courts that:

" 'the drinking of alcoholic beverages and not the serving is the proximate cause of any injury that results to the drinker from his own intoxication.' "*Id.*

In *Ewing,* a wrongful death action brought on behalf of the decedent's two minor sons, the complaint alleged both negligence and wilful misconduct against the Cloverleaf Bowl. In that case, an experienced bartender "knowing that a patron had just turned 21 * * * served his young customer 10 straight shots of 151 proof rum, as well as a vodka collins and 2 beer chasers, during a period of less than an hour and a half." *Id.,* at 394, 572 P. 2d at 1156. The decedent, Christopher Ewing, was rendered unconscious and died. The autopsy revealed that decedent's blood alcohol level was 0.47. At the close of plaintiff's evidence, the trial court granted defendant's motion for nonsuit, dismissed the jury, and entered judgment for the Cloverleaf Bowl.[7]

---

[6] A standard of care very similar to that imposed upon the liquor vendors in *Mason* v. *Roberts, supra; see also Howard* v. *Rogers* (1969), 19 Ohio St. 2d 42.

[7] The legal questions presented in *Ewing* were analyzed under pre-*Li* law; that

Approaching the liability question under contributory negligence analysis, the California high court turned its attention to the preliminary issue raised on appeal: whether the trial court erred in removing the factual determination of negligence from the jury. The court approached the question thusly:

"***[W]e must initially determine whether a jury, if it could conclude that Lamont's [bartender] conduct breached defendant's duty of care to Christopher Ewing [decedent], could also conclude that such conduct amounted not merely to negligence but to willful misconduct. Next, we must consider a jury's possible assessment of Christopher Ewing's conduct: whether a jury could reasonably conclude that Ewing's conduct amounted to no more than contributory negligence, or rather, whether the jury must conclude that Ewing's conduct amounted to willful misconduct.

"If a jury could reasonably find only that the bartender was negligent and that Ewing was also negligent, Ewing's contributory negligence would of course bar plaintiffs' recovery and justify the trial court's nonsuit. If, however, a jury could find that Lamont's conduct amounted to willful misconduct, while Ewing's conduct was merely negligent, plaintiffs could recover*** and the trial court's nonsuit would be erroneous. Finally, if a jury could reasonably conclude only that Lamont's conduct and Ewing's conduct constituted similarly willful misconduct, plaintiffs would again be barred."[8] *Id.*, at 401, 572 P. 2d at 1160. (Citations omitted.)

"Willful misconduct," under California law, " 'implies the intentional doing of something either with knowledge, express or implied, that serious injury is a probable, as distinguished from a possible, result or the intentional doing of an act with a wanton and reckless disregard of its

---

is, under principles of contributory negligence rather than comparative negligence. *Ewing* v. *Cloverleaf* (1978), 20 Cal. 3d 389, 395, Note 1, 572 P. 2d 1155, 1156. *See Li* v. *Yellow Cab Co.* (1975), 13 Cal. 3d 804, 532 P. 2d 1226 (court abrogated doctrine of contributory negligence and judicially adopted comparative negligence in its "pure" form).

[8] The court additionally considered the question of whether the decedent assumed the risk of acute alcohol poisoning, concluding that: "If assumption of risk is thus established as a matter of law, plaintiffs could not recover even if a jury could find that the bartender's conduct amounted to willful misconduct." *Id.*, at 401, 572 P. 2d at 1161.

consequences.' " *Id.,* at 402, 572 P. 2d at 1161. With the definition of willful misconduct established, the *Ewing* court proceeded to review the activities of the bartender Lamont, viewing them in a light most unfavorable to him for purposes of nonsuit analysis. The court set forth the "salient aspects" of the activities, concluding that the acts suggested not merely a want of ordinary care but willful misconduct, as follows:

"Lamont plainly acted intentionally in serving liquor to Chris Ewing. He also acted intentionally in serving Ewing 151 proof rum. Jerry Powers asked only for 'the strongest drink in the house'; it was Lamont who initially selected the rum. Moreover, because Lamont had to remove the rum from its shelf below the bar before serving Chris, and reshelve it after each serving, the jury could reasonably conclude that Lamont did not serve Chris even the last shots of rum without knowledge of the specific drink he was serving.

"Lamont knew the significance of differences in proof. He knew, further, that the rum which he served Chris was anywhere from twice to half again the potency of ordinary liquors. Moreover, Lamont knew that Chris was probably an inexperienced drinker; not only his age, which Lamont knew, but the apparent novelty he saw in drinking, suggested this fact. Lamont could conclude, therefore, that Chris was not fully aware of the radical difference in potency between the rum and ordinary liquor; indeed, Lamont's own warnings to Chris evidence Lamont's knowledge of this relative disparity in experience.

"Lamont knew that Chris intended to get drunk; Chris said so. Lamont also knew that his own warning to Chris to take it easy, urged after pouring the third round, had been without effect. Knowing that Chris probably did not fully comprehend the implications of the high potency of the liquor he was drinking, and knowing as well of Chris' intent to get drunk, Lamont could have concluded, or should have concluded, that Chris might consume an amount of liquor hazardous to his health. As a bartender with 11½ years of experience, Lamont knew or should have known that, beyond a certain level, consumption of alcohol creates an immediate health hazard.

"Finally, Lamont acted in violation of two rules of practice at the Cloverleaf Bowl. He repeatedly filled the shot

glasses beyond the seven-eighths line, in contravention of ordinary policy. Moreover, in view of the testimony of Jean Enos, he continued to serve Chris after Chris was manifestly intoxicated, in violation of a posted rule, and even attempted to serve Chris after his brother Doug's arrival, at a point at which Chris was barely conscious." *Id.*

The court stressed that the above facts would permit a jury to reasonably find willful misconduct on the part of the bartender, but noted that it is not "the only rendition that a jury could reasonably attach to Lamont's conduct;***." *Id.,* at 404, 572 P. 2d at 1162.

The majority then concluded that a reasonable jury could arrive at the determination that Christopher Ewing was merely negligent, thereby precluding the removal of the liability issues from the jury. Furthermore, the court found that a reasonable jury could conclude that the decedent did not assume the risk of the bartender's willful misconduct since the precise risk, acute alcohol poisoning, was not one which the decedent appreciated. The court reversed and remanded for further proceedings.[9]

We accept, in substance, the *Ewing* court's analytical approach to this precise question, applying the principles of contributory negligence. We recognize as well that in doing so, we have leaped substantially forward—closing a gap in Ohio

---

[9] "In this case, a commercial vendor of liquor, an experienced bartender, knowing that the youthful patron standing before him had become 21 years of age that day, served the young customer in the course of one and a half hours lethal quantities of the 'strongest drink in the house.' The youth died of acute alcohol poisoning. Yet the trial court cast an armour of protection around this entrepreneur based upon an inflexible rule that a patron who suffers injury from his own intoxication cannot recover from a bartender, no matter how negligent or reckless the bartender's conduct may be. Even assuming the negligence of the young patron, a jury could very well find willful misconduct on the part of the bartender; such conduct would remove the bar of contributory negligence. A jury could also very well conclude that, while contributorily negligent, the youthful patron did not assume the risk of acute alcohol poisoning, the risk of his own death." *Id.,* at 407, 572 P. 2d at 1164.

Justice Clark, dissenting, expressed the view that the decedent's conduct amounted to recklessness and willful misconduct as a matter of law. While stating that since the decedent's misconduct was willful, the lone dissenter concluded it was unnecessary to consider the assumption of risk question. However, he did close his comment with the following inquiry: "How can it be objectively stated, even as a matter of law, that Christopher did not knowingly assume the risk of acute alcoholic poisoning?" *Id.,* at 410, note 4, 572 P. 2d at 1166.

much greater than that bridged by the California Supreme Court in *Ewing.* Unlike the California courts, Ohio courts have not had the occasion to address this and similar questions, thereby failing to provide a reasoned framework upon which to develop a fair and thoughtful approach to these questions. The advance taken herein is, we believe, consistent with the spirit of *Mason* v. *Roberts, supra,* although it admittedly goes considerably beyond the rather narrow reach of that decision.[10]

In light of the above, we turn to the facts surrounding the death of Timothy Woernley. If we find, based on this record, that a jury of reasonable persons could find The Mark II negligent and Timothy Woernley without negligence, then the court erred in directing a verdict for The Mark II. If we conclude that a jury could reasonably find only that both parties were negligent, Timothy Woernley's contributory negligence would bar appellant's recovery. Furthermore, if we find that a jury could conclude that appellee's conduct was such as to constitute willful misconduct, and Woernley's conduct to be merely negligent, appellant could recover. Finally, if a jury could reasonably conclude only that the conduct of both parties amounted to willful misconduct, recovery would be barred, and the trial court properly directed a verdict for appellee. *Ewing* v. *Cloverleaf Bowl, supra.*

Construing the evidence most strongly in favor of appellant, we hold that a jury *could* reasonably find only that The Mark II was negligent in continuing to serve a patron when it knew or should have known that he was intoxicated, and that such jury could only have concluded that Woernley's conduct amounted to willful misconduct. We emphasize that a jury could also reasonably find that The Mark II was not negligent. However, we cannot conclude, even construing the evidence most strongly in appellant's favor, that Timothy Woernley's conduct amounted to anything less than willful misconduct as a matter of law.

[10] We read *Mason* to at least hold that Ohio recognizes common law liability to now extend, under certain circumstances, to liquor vendors.

Other jurisdictions resolve the question in various ways. *Meade* v. *Freeman* (1969), 93 Idaho 389, 469 P. 2d 54; *Nolan* v. *Morelli* (1967), 154 Conn. 432, 226 A. 2d 383; *Rappaport* v. *Nichols* (1959), 31 N.J. 188, 156 A. 2d 1; *Waynick* v. *Chicago's Last Department Store* (C.A. 7, 1959), 269 F. 2d 322, *certiorari* denied, 362 U. S. 903 (1960).

Aside from the very obvious factual distinctions between the instant case and *Ewing,* we think it clear that the decedent's own voluntary actions were the proximate cause of his vehicle's impact with the tree; that is, but for the decedent's excessive speed and reckless operation of the vehicle in an attempt to elude a police officer, the tragic accident would not have occurred. Without the testimony, therefore, of Officer Kenneth Novak, we concede a jury question would have been presented and the directed verdict precluded. Officer Novak testified that the decedent was traveling sixty one miles per hour in a thirty five mile per hour zone, made an illegal right-hand turn through a red light, and attempted to elude a police officer by increasing his speed. These were all violations of state and municipal laws.[11] Additionally, the officer testified that Woernley attempted a turn from the street into a residential driveway at a speed estimated to be fifty miles per hour, notwithstanding the decedent's personal knowledge of the existence of the tree within a close proximity to the driveway. Timothy Woernley had to have known of the tree, since he obviously intended to turn into his parent's driveway. The record further indicates that Timothy Woernley lived with his parents at the time of his death.[12]

"Driving while intoxicated is not of itself sufficient to constitute an act of wanton or willful misconduct. * * * Neither is speed alone sufficient to state a good cause of action for wanton misconduct. * * * However, either speeding or driving while intoxicated may constitute an act of wantonness where the concomitant facts present an unusually dangerous situation and there is a consciousness on the part of the driver that his conduct will in all probability result in injury to another."

---

[11] *See,* for instance, R. C. 4511.02, which reads, in pertinent part:

"No person shall operate a motor vehicle so as to willfully elude or flee a police officer after receiving a visible or audible signal from a police officer to bring his motor vehicle to a stop." Revised Code 4511.19 provides, as relevant herein:

"No person who is under the influence of alcohol***shall operate any vehicle***within this state."

[12] Decedent's 1973 Federal Income Tax Return, signed by him on February 25, 1974, listed his parent's address as his present home address. Moreover, the Ohio Department of Health Certificate of Death, the coroner's autopsy protocol, and the Parma Community General Hospital emergency room report all list the decedent's parents' home address as his own.

*Gossett* v. *Jackson* (1965), 10 Ohio App. 2d 121, 123. (Citations omitted.)

"Wanton misconduct", as recently redefined in *Hawkins* v. *Ivy* (1977), 50 Ohio St. 2d 114, is as follows:

"Where the driver of an automobile fails to exercise any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under circumstances in which there is great probability that harm will result, such failure constitutes wanton misconduct." (Syllabus.)

The fact that Timothy Woernley was legally intoxicated does not relieve him from exercising the degree of care imposed upon a sober person under the same circumstances. *Zalewski* v. *Yancey* (1956), 101 Ohio App. 501.

The following facts clearly evidence recklessness on the part of Timothy Woernley. Notwithstanding at least two admonitions to "calm down" and one attempt by his brother-in-law, Richard Samples, to get him to drink coffee, Timothy Woernley continued to drink. Even though Richard Samples phoned Woernley's sister in order to have someone come and drive Woernley home, upon the arrival of his brother-in-law and cousin, Woernley absolutely refused their assistance. Samples, nonetheless, removed Woernley's car keys from him, which precipitated a physical confrontation between the two men. All the while, Samples continued to advise Woernley that he was in no condition to drive. In light of Woernley's continued behavior, Samples was forced to ask the two men to return Woernley's keys. Woernley, therefore, although having been admonished that he was in no condition to drive, persistently insisted on the return of his keys even though his brother-in-law and cousin were called for the expressed purpose of driving him home. Construing this evidence in a light most favorable to the appellant, we admit that a jury question is presented. However, when read in conjunction with the testimony of Officer Kenneth Novak, the case becomes one which is properly resolved on a motion for a directed verdict.

Officer Novak testified that Timothy Woernley exceeded the posted speed limit, made an illegal right-hand turn on red, and attempted to elude a police officer, all in violation of state and municipal laws. Additionally, decedent operated his vehicle while under the influence of alcohol. The unexcused

failure of the decedent to adhere to the most rudimentary traffic laws constitutes negligence *per se*. *Zehe* v. *Faulkner* (1971), 26 Ohio St. 2d 258; *Oechsle* v. *Hart* (1967), 12 Ohio St. 2d 29. Decedent's attempt to elude a pursuing officer constitutes willful and wanton misconduct, and when coupled with the utter reckless act of attempting to negotiate a turn at night into a residential driveway, adjacent to a large tree, at the approximate speed of 50 miles per hour, such conduct must necessarily amount clearly to willful and wanton misconduct as a matter of law. Such conduct evidenced an absolute failure to exercise reasonable care under conditions which rendered probable a likelihood that harm would result to himself or others. *Hawkins* v. *Ivy, supra*.

Certainly, the cause of death is clearly distinguishable from that at issue in *Ewing*. There, the death of Christopher Ewing was directly the result of the consumption of an excessive amount of 151 proof alcohol in a very short period of time. The experienced bartender should have foreseen that death by acute alcohol poisoning could result under those circumstances. Here, the cause of death is not the result of acute alcohol poisoning and, we believe, not proximately the result of the decedent's consumption of alcoholic beverages at The Mark II, specifically since the record clearly indicates that the decedent was neither a minor nor a habitual alcoholic. *See generally Pratt* v. *Daly* (1940), 55 Ariz. 535, 104 P. 2d 147.

For the reasons expressed herein, we find appellant's appeal to be not well taken. The law mandates that the decision of the court below granting appellee's motion for a directed verdict should be affirmed.

*Judgment affirmed.*

KRUPANSKY, P. J., concurs.

DAY, J., concurs in the judgment only.

DAY, J., concurring in the judgment only. I concur in the result in this case but not in all of the conclusions incident to the analysis. I confine my conclusions to the propositions that decedent would not have died but for his own willful misconduct and that a jury could not have reasonably found otherwise.